EDGAR B. SIMS, *Auditor, etc. et al. v.* JAKE FISHER, *Judge, etc.*

(No. 9466)

Submitted February 16, 1943. Decided March 26, 1943.

*Ira J. Partlow,* Acting Attorney General, *Kenneth E. Hines,* Assistant Attorney General, and *Dana C. Eakle,* for relators.

*Jake Fisher,* in person.

FOX, JUDGE:

The Legislature of this State, at its 1941 session, enacted Article 4, Chapter 117, a statute covering the sale for the benefit of the school fund of lands waste and unappropriated, or the title to which has or may hereafter become vested in the State, through escheat, forfeited for nonentry, or purchased at a sheriff's sale of delinquent lands for nonpayment of taxes and not redeemed. The act constitutes the auditor of the State as ex-officio commissioner of forfeited and delinquent lands, and authorizes him to appoint a deputy commissioner in each county of the State. It further provides that on or after the 1st day of January, 1942, and during the month of January in each

year thereafter, the auditor, acting as such commissioner, shall certify to the circuit court, and to the deputy commissioner of each county in the State, all lands subject to sale for the benefit of the school fund, requiring each of the four classes of land subject to sale to be separately listed and reported, together with a statement of taxes due on lands forfeited for nonentry, or sold to the State at delinquent sales. Provision is made for the redemption of certain classes of such lands from the deputy commissioner, prior to the sale provided for in the act.

In enacting Article 4 of Chapter 117, the Legislature made the following declaration of its intent and purpose:

"It is the intent and purpose of the Legislature to abolish the existing judicial proceedings for the sale of land for the school fund, and to substitute therefor an administrative ex parte proceeding, thus reverting to the practice originally established and sanctioned in this State. The procedure provided for in this article is designed to convey to the purchaser not an original but merely a derivative title."

The above declaration, while not controlling upon this Court as to what the Legislature actually did, is useful in determining the legal consequences of the enactment.

Section 14 of Article 4 of the act reads as follows:

"At any time after certification by the auditor, the deputy commissioner may apply to the circuit court, or to the judge thereof in vacation, for an order fixing a date for the sale and for the first publication of the list and the notice of sale. If the deputy commissioner fails to make such application within thirty days after certification, he shall forfeit one hundred dollars. When such application is made, the court or judge, after fixing the dates, shall order the deputy commissioner: (1) To prepare, as provided in section sixteen of this article, the list of lands to be sold; (2) to publish, on the date fixed, the list and the notice of sale as required by section sixteen of this article; and (3) to sell, on the date fixed for the sale,

each unredeemed item for the amount stated in the published list as the amount then due thereon.

"In applying for the order, the deputy commissioner shall give to the court or judge his estimate as to the time necessary for making the computation of the amount due, and the court or judge shall consider that estimate in fixing the date of first publication. The date fixed for the sale shall not be less than sixty nor more than ninety days after the date named in the order for the first publication of the notice."

The petition of the relators, hereinafter mentioned, avers the performance by the auditor of his duties under the act relating to the appointment of a deputy commissioner for Clay County, and the certification to the circuit court of that county, for sale, of the several classes of land subject to sale and situate therein. The respondent is Judge of the Circuit Court of Clay County, and was sitting in term as such circuit court on February 1, 1943, when the relator, Dana C. Eakle, deputy commissioner, filed in said court his petition praying that the court fix a date for the sale of the lands listed and described therein, as provided for in the section of the statute quoted above. The court refused and declined to entertain said petition, and thereupon the relator, Edgar B. Sims, Commissioner of Forfeited and Delinquent Lands of the State of West Virginia, and Dana C. Eakle, deputy commissioner for Clay County, on February 4, 1943, filed their petition in this Court, seeking a writ of mandamus against Jake Fisher, Judge of the Circuit Court of Clay County, praying that we command him, as such Judge, either in term or in vacation of said court "to entertain, consider and grant the prayer of such petition", if and when presented. We awarded a rule to show cause why such writ should not issue, to which respondent appeared, and entered his demurrer to the petition aforesaid, assigning grounds in support thereof, to which, along with briefs filed, we have given consideration.

The controversy largely centers around Section 14 of Article 4 of the act quoted above; but, inasmuch as other matters will be discussed, we deem it proper to outline briefly the purposes sought to be accomplished by the act. Throughout this opinion references to sections should be understood to be to sections of Article 4 of Chapter 117, Acts of 1941.

We have already outlined the provisions of the act up to and including Section 14 thereof. Sections 15, 16, and 17, cover requirements on the part of the clerk of the circuit court, with reference to records necessary to be kept; the publication and posting of lists of land ordered sold; and an application by any person substantially interested to have the amount of taxes and costs for which any land is to be sold reduced. Section 18 provides that any persons substantially interested may apply to the circuit court, or to the judge thereof in vacation, for an order suspending from sale any lands as to which he makes any of the following claims: (1) That all taxes thereon were paid before sale to the State; (2) that the land was redeemed after sale to the State; (3) that the land has not been escheated; (4) that it has not been forfeited for nonentry; (5) that it had been sold to him at a former sale for the benefit of the school fund, and had not been thereafter sold to the State for nonpayment of taxes, or forfeiture for nonentry; and (6) that he had acquired title to the land by transfer under the provisions of Section 3, Article XIII of the Constitution. Section 19 authorizes the circuit court to suspend the sale of land, and provides for a hearing, after which the court may or may not order the sale to proceed. Section 20 provides that a person aggrieved by the refusal of the circuit court to enter what it terms an administrative order, applied for under Section 18 of Article 4, may present a petition in writing to the Supreme Court of Appeals praying for review of such action. Section 21 provides for the sale of land and report thereof to the circuit court. It is required that this report show the tracts redeemed before sale, suspended from sale, or

sold, and, if sold, the name of the purchaser. Section 22 provides for the issuance of receipt for the purchase money for any land sold, on a form to be prescribed by the auditor. Section 23 provides that the deputy commissioner shall purchase for the Public Land Corporation of West Virginia, for the amount stated to be due in the published list, any tract on which no bid is made, or where the bid is less than the amount due; and he is also authorized to purchase any escheated or waste and unappropriated land on which no bid is made. It is also provided in this section that if the highest bid on any escheated or waste or unappropriated land is not approved by the court, such land shall be sold to the deputy commissioner, in open court, for the Public Land Corporation, for the amount of the publication and other charges, and provides for the return by him of the purchase money to the person whose bid is not approved. The purchase of any lands by a deputy commissioner, clerk of a county or circuit court, sheriff, assessor, or deputy of either, is prohibited by Section 24. Section 25 provides for the payment of any surplus derived from the sale of lands sold to the former owner, and this surplus is made liable to the claim of his creditors. Section 27 provides that after the sale of any such lands, to an individual, the same may be redeemed by any interested person at any time before confirmation, upon the payment of the purchase price, with interest, taxes subsequent to sale, and other expenses; and by Section 28 it is provided that lands sold to the Public Land Corporation may likewise be redeemed. This right is extended to other persons interested in the land by Section 29, and provision is made in Section 30 for payment of redemption money to the clerk of the circuit court. Under Section 31, if the deputy commissioner, or the purchaser, disputes the right of any person to redeem by making payment to the clerk, he may, within one year after such payment, and upon notice to the person so redeeming, test the right to redeem. It is provided that "Proceedings under this section, like those under the corresponding section, num-

bered nineteen, in article three of this chapter, shall be brought before the court in its judicial capacity rather than in its capacity as the administrative agency for the sale of state lands, and shall, in respect to procedure at the hearing and upon appeal, and in other particulars, including taxation of costs, be governed by rules applicable to other similar judicial proceedings". Section 32 provides that in case of sale of forfeited or delinquent lands to an individual purchaser, he shall within sixty days secure and file with the clerk of the circuit court a plat and description of the land purchased, examine the title in order to prepare a list of those persons to be served with notice to redeem, and apply to the judge of the circuit court for an order directing the clerk to prepare and serve notices to redeem, for which certain fees are to be paid to the deputy commissioner; and the same general provisions apply to land sold to the Public Land Corporation under the provisions of Section 33, and Section 34 provides for the survey and plat aforesaid. By Section 35 it is provided that, after complying with the provisions with respect to plat and examination of title, the individual purchaser, or if such land was sold to the Public Land Corporation, the deputy commissioner, must apply to the circuit court, or to the judge thereof in vacation, for an order directing the clerk to prepare and serve notices to redeem on all persons named in the prepared list as entitled to such notices, and the form of such notice is outlined in Sections 36 and 37. By Section 38, it is required that the notice aforesaid be served on the person in whose name the real estate was forfeited or sold, or in case of his death, his heirs, devisees, or personal representatives, or any grantee of such person, if conveyance to him is recorded in the county clerk's office, and on any person having a lien upon the land disclosed by any recorded paper in the county clerk's office, or any other person having sufficient interest in the property as would entitle him to redeem, the existence of which interest appears of record. This notice is required to be served personally upon persons residing in

the State, in the same manner as process commencing a suit is served, and if not found in the State by publication once a week for three successive weeks. Under Section 39 it is provided that persons entitled to apply for an order suspending sale, who are not advised of the proposed sale in time to protect themselves therefrom, may at any time after the sale, and before confirmation, institute a proceeding to set aside the sale, upon notice in writing to the purchaser, or to the Public Land Corporation, stating the basis of his claim, and the court is given the power to enter an order setting aside the sale. It is provided that proceedings under this section shall be considered by the court in its judicial capacity rather than in its capacity as an administrative agency for the sale of state lands. Section 40 provides that if the real estate described in the notice to redeem is not redeemed before the date fixed for confirmation, named therein, or the sale is not set aside, the deputy commissioner or the purchaser may apply to the circuit court, or to the judge thereof in vacation, for an order confirming the sale, and the court, upon a showing that all requirements have been met, shall enter such order. Upon the refusal of the court to enter such order, upon the application of an individual purchaser, he may demand a hearing, as provided in Section 19, and upon such hearing, if the court again refuses to enter the order applied for, its action may be reviewed by the Supreme Court of Appeals, as provided for in Section 20. The section then provides that, upon confirmation of the sale, all rights of the former owner shall be terminated, except those of persons under disability expressly saved by the provisions of Section 49. For failure to apply for confirmation of sale of any forfeited or delinquent lands within sixty days after the date specified in the notice to redeem, or, in the case of escheated or waste and unappropriated lands within sixty days after the first day on which such application might properly have been made, an individual purchaser shall lose all the benefits of his purchase, and the land shall be included by the auditor

in his next certification of lands to the circuit court. Section 41 provides for the recordation of the deed to an individual purchaser. Section 42 provides that on confirmation of sale to the Public Land Corporation, title to the real estate sold shall, without any deed, be vested in said corporation. Section 43 provides that the title acquired by any individual purchaser shall be the right, title and interest in the real estate sold that was vested in or held by any person who was entitled to redeem, unless such person is one who, being required by law to have his interest separately assessed and taxed, had done so and had paid all taxes due thereon, or unless saved by the provisions of Sections 34, 45, 46, or 49 of Article 4. It is provided that the deed shall be conclusive evidence of the acquisition of such title and shall relate to the date of the sale. The title acquired by the Public Land Corporation is the same as that acquired by an individual purchaser. Section 44 covers the matter of irregularities, errors or mistakes. Sections 45, 46, and 47 each relates to the right of persons entitled to an order suspending any land from sale, or for the right to redeem, or who have not been served with notice to redeem, to institute a suit to set aside any sale made, or any deed executed, either to an individual or to the Public Land Corporation; and under Section 42 such suit, if brought by a person other than the former owner, his heirs or assigns, must be brought on his or their behalf. Section 49 provides for redemption of lands sold by persons under disability. Sections 50 to 54 of the act, both inclusive, relate to reports by the deputy commissioner to the auditor, keeping of accounts by the sheriff, the disposition of pending suits, penalties imposed upon officers failing to perform their duties, and the release of taxes prior to the year 1929, and are not important to this inquiry.

A study of Article 4 of the act, in its entirety, discloses that important questions arise thereunder, many of which we shall discuss, but three outstanding points are presented:

(1) Has the Legislature power, under the Constitution of this State, to impose administrative or non-judicial duties on the courts;

(2) Whether under Sections 4 and 5 of Article XIII of our Constitution, there can be a sale of land, the title to which is claimed to be vested in the State and sought to be sold for the benefit of the school fund, without a judicial determination that title thereto is so vested, and such land subject to sale;

(3) Whether a sale of such lands to an agency of the State, the Public Land Corporation of West Virginia, constitutes the sale thereof contemplated and required by Section 4 of Article XIII of our Constitution.

It is obvious that, technically, a negative answer to the first question will result in a denial of the writ prayed for; yet, in our opinion, the importance of the matter before us justifies a discussion of the other questions stated, and other questions properly related thereto, as well.

The provisions of our State Constitution which bear upon the first question presented are Article V and Sections 1, 3 and 12 of Article VIII. Article V, bearing upon the separation of powers, reads as follows:

> "The Legislative, Executive and Judicial Departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the Legislature."

As corollary to Article V, Section 1 of Article VIII, reads as follows:

> "The judicial power of the State shall be vested in a supreme court of appeals, in circuit courts and the judges thereof, in such inferior tribunals as are herein authorized and in justices of the peace."

Section 12 of Article VIII, relating to the jurisdiction of circuit courts provides:

"The circuit court shall have the supervision and control of all proceedings before justices and other inferior tribunals, by *mandamus,* prohibition and *certiorari.* They shall, except in cases confined exclusively by this Constitution to some other tribunal, have original and general jurisdiction of all matters of law where the amount in controversy, exclusive of interest, exceeds fifty dollars; of all cases of *habeas corpus, mandamus, quo warranto* and prohibition; and of all cases in equity, and of all crimes and misdemeanors. They shall have appellate jurisdiction in all cases, civil and criminal, where an appeal, writ of error or *supersedeas* may be allowed to the judgment or proceedings of any inferior tribunal. They shall also have such other jurisdiction, whether supervisory, original, appellate, or concurrent, as is or may be prescribed by law."

Section 3 of Article VIII, defining the jurisdiction of this Court is in the following language:

"It shall have original jurisdiction in cases of *habeas corpus, mandamus,* and prohibition. It shall have appellate jurisdiction in civil cases where the matter in controversy, exclusive of costs, is of greater value or amount than one hundred dollars; in controversies concerning the title or boundaries of land, the probate of wills, the appointment or qualification of a personal representative, guardian, committee or curator; or concerning a mill, road, way, ferry or landing; or the right of a corporation or county to levy tolls or taxes; and, also in cases of *quo warranto, habeas corpus, mandamus, certiorari,* and prohibition, and in cases involving freedom or the constitutionality of a law. It shall have appellate jurisdiction in criminal cases where there has been a conviction for felony or misdemeanor in a circuit court, and where a conviction has been had in any inferior court and been affirmed in a circuit court, and in cases relating to the public revenue, the right of appeal shall belong to the

State as well as the defendant, and such other appellate jurisdiction in both civil and criminal cases, as may be prescribed by law."

In *McClure* v. *Maitland,* 24 W. Va. 561, this Court passed on a case where land was sought to be sold under the provisions of Section 4, Article XIII of our Constitution, and Chapter 134 of the Acts of 1872-3, enacted thereunder, of which a circuit court had taken jurisdiction. In that case it was held that a proceeding provided for by the statute then in force was purely ex parte and administrative; but the power of the circuit court to entertain such a proceeding was neither raised, discussed nor decided, and it may be reasonably contended that, at that time, this Court believed that such jurisdiction existed. Later, in *Wheeling Bridge and Terminal Railway Co.* v. *Paull, Judge,* 39 W. Va. 142, 19 S. E. 551, 552, relating to the assessment of property for taxes by the board of public works, a purely administrative proceeding, we held that an appeal from the board of public works to the circuit court was constitutional and valid on the general theory that the "ascertainment of the values of property (for the purposes of taxation) is strictly judicial". *Mackin* v. *County Court,* 38 W. Va. 338, 18 S. E. 632, an appeal from a reassessment of lands is cited in support of the Court's conclusion. *In re Town of Union Mines,* 39 W. Va. 179, 19 S. E. 398, we held that the statute then in force relative to the incorporation of cities, towns and villages, so far as it conferred on circuit courts functions in their nature judicial and administrative, although in furtherance of the legislative department of the State government, was constitutional and valid. These opinions, while they have been criticized, stand unreversed, and are generally recognized as exceptions to the rule announced on this question in subsequent opinions of this Court, the exception being attempted to be justified on the ground of public policy. By inference, at least, the decisions as to assessments of property have been lately upheld by this Court in *Norfolk & Western Ry. Co.* v. *Board of Public Works,* 124 W. Va.

562, 21 S. E. 2d 143, and *Western Maryland* v. *Board of Public Works,* 124 W. Va. 539, 21 S. E. 2d 683.

The broad question of separation of powers in all its aspects was first presented to this Court in *Hodges* v. *Public Service Commission,* 110 W. Va. 649, 159 S. E. 834. There we held: "The Legislature cannot commit to the judiciary powers which are primarily legislative. Article V of the Constitution was applied." That case arose out of what is known as the Water Power Act of 1929, Chapter 58, Acts 1929, which so far as it affected the Court, provided for an appeal from any action thereunder by the Public Service Commission to the Circuit Court of Kanawha County, with provision for trial *de novo* on the appeal, and upon the original record made before the Public Service Commission. The act was held unconstitutional, and we cannot do better than refer to the opinion of Judge Hatcher, which clearly presents the reason for the holding, and attempts to justify the seeming inconsistency between the opinion in that case and the earlier cases relating to the assessment of property and the incorporation of towns.

In *Staud* v. *Sill,* 114 W. Va. 208, 171 S. E. 428, where the Legislature attempted to impose upon circuit courts the duty of passing upon the confirmation of sales under deeds of trust, we held that the duties required of the court were not judicial, and the act unconstitutional, relying strongly on the *Hodges* case and citing many cases from other jurisdictions. See also *Baker* v. *Tyler County Court,* 112 W. Va. 406, 164 S. E. 515; *Danielley* v. *Princeton,* 113 W. Va. 252, 167 S. E. 620; *County Court* v. *Painter,* 123 W. Va. 415, 15 S. E. 2d 396.

In view of these holdings we think it clear that this Court has settled on a policy of strong adherence to the several constitutional provisions relating to the separation of powers, as conferred on the three departments of the State government, and particularly as to the jurisdiction of courts, and the powers they may assume or decline to exercise. Further, that any departure from this strict rule

in the past, shall not be permitted to operate as a precedent for additional violations of these provisions now or in the future, under whatever guise such a proposition may be presented. This is as it should be. The Constitution has wisely provided for its amendment, and the way being open therefor, courts are not justified in assuming powers not granted, even though asked to do so by legislative enactment. In this case, the Legislature has required of the circuit courts, and this Court, the exercise of functions not of a judicial nature, and has plainly stated its intent and purpose in that regard. In the same enactment it has required of circuit courts the performance of duties which it terms "judicial" as distinguished from what it terms "its capacity as an administrative agency for the sale of state lands." With all deference to the will of the Legislature, we do not think it possesses the power to require any court to act as an "administrative agency"; and any court which acts in such capacity violates the. plain provisions of our Constitution. We are of the opinion, therefore, that the provisions of Article 4, Chapter 117, Acts 1941, which assumes to require the performance of administrative duties by circuit courts, in connection with the sale of lands for the benefit of the school fund, is plainly unconstitutional.

What has been said in relation to circuit courts, more strongly applies to this Court. The act provides that as to certain proceedings there may be a review by, and therefore an appeal to this Court. The Constitution, Section 12 of Article VIII, dealing with circuit courts, provides for the exercise of powers "supervisory, original, appellate, or concurrent, as is or may be required by law", which phrase we have held in the *Hodges* case refers to matters "essentially juridical." As far as concerns this Court, there is no such provision. By Section 1, Article VIII, the judicial power and none other, is vested in this Court, in circuit courts and their judges, certain inferior courts authorized by the Constitution, and in justices of the peace. Section 3 of Article VIII, defining the jurisdiction of this Court, refers alone to judicial proceedings. It has original

jurisdiction in habeas corpus, mandamus and prohibition, and appellate jurisdiction in civil cases of a defined nature, and limited jurisdiction in criminal cases, and such other appellate jurisdiction in both civil and criminal cases as may be prescribed by law. Its powers, appellate and original, relate to "cases" which necessarily means a judicial proceeding of some character. In *Railway Co.* v. *Board of Public Works,* 28 W. Va. 264, this Court in the body of its opinion had this to say:

"It is a plain proposition, that the Constitution of this State confines the jurisdiction of this Court exclusively to judicial matters. It possesses both original and appellate jurisdiction, but by the very terms of the constitution all of its powers, whether of the one class or the other, are wholly and exclusively judicial, and the legislature has no authority to confer upon it jurisdiction of any other or different character. Any other construction of the Constitution would enable the legislature to confer executive or legislative powers upon this Court and thus unite the executive or legislative and the judiciary departments of the State-government in the same person, which is positively forbidden by the fifth article of our Constitution."

And these propositions were carried into the syllabus. In *Wheeling Bridge and Terminal Railway* v. *Paull, supra,* we held, "The jurisdiction of the Supreme Court of Appeals is limited by the Constitution to matters formerly considered judicial and also to many matters which formerly belonged to the legislative department of the government; and there is no general clause permitting the legislature to add to or take from its jurisdiction, except in civil and criminal cases. But this can only be done by amendment to the Constitution". See also *Gas Co.* v. *Public Service Commission,* 73 W. Va. 571, 80 S. E. 931, where numerous decisions of this Court are cited to sustain the proposition. Therefore, any section of the act in question which provides for a review by this Court of any matter not judicial is unconstitutional.

This brings us to the second question raised above. The respondent bases his refusal to entertain and act on the petition of the deputy commissioner on the contention, that, under Section 4 of Article XIII of the Constitution there can be no sale of waste and unappropriated lands, escheated lands, lands forfeited for nonentry, or purchased at a sheriff's tax sale and not redeemed, until there has been a judicial determination that title to the land sought to be sold is vested in the State by one of the several methods mentioned above. This raises an important question and one which, in our opinion, is of vital concern to the owners of real estate, present and prospective. Our decision on this point may be better understood if we first trace the history and development of the laws in Virginia and this State, in relation to the sale of forfeited, delinquent, escheated or waste and unappropriated lands. While this history is minutely traced in *McClure* v. *Maitland, supra,* and *Holly River Coal Co.* v. *Howell,* 36 W. Va. 489, 15 S. E. 214, we are perhaps justified in a further brief statement.

In May, 1779, the Commonwealth of Virginia, through legislative action, provided for the sale and grant of its unappropriated lands, the greater part of which lay west of the Alleghany Mountains, and under this, and subsequent statutes, most of the lands west of the mountains, in what is now West Virginia, were granted. The process was to purchase a land warrant for a given number of acres, and then survey and locate the land, and secure a grant from the Commonwealth. The result was that frequent grants were made for the same land to two or more persons. These lands were sometimes granted in large tracts, not only of thousands of acres, but in some instances hundreds of thousands of acres were granted to a single individual. Under this system grew up claims under junior grants where, for any reason, the original grantees lost title to the State. In this situation, owners of land, particularly the larger tracts, began to default in the payment of taxes thereon. Many statutes were enacted in

an effort to collect these taxes, and finally in 1814 the first comprehensive statute was passed which permitted the redemption of forfeited and delinquent lands, the proceeds of which redemptions were to be paid into the literary fund, which generally conforms to our school fund. In 1831 an act was passed forfeiting lands theretofore delinquent for nonpayment of taxes, and later the time for redemption was extended to October 1, 1834. In 1835 an act was passed forfeiting lands for nonentry and the exemption period was extended to November 1, 1836.

By acts passed on March 30, 1837, and March 15, 1838, jurisdiction was conferred on the superior court of law and chancery to institute an inquiry as to forfeited and delinquent lands, and the office of commissioner of forfeited and delinquent lands was created for each county, to be appointed by the superior court. The duty of such officer was to ascertain and report to the court all waste and unappropriated lands, or such as had escheated to the state, become forfeited for nonentry, or sold for taxes and not redeemed, the number of tracts, acreage, local situation, and probable value. The court, on the filing of such report, was required to direct the sale of such lands, by an order entered of record, such sale to be made by said commissioner in the same manner as other lands were sold under decrees of the court. Later acts were passed giving to former owners a period of time in which they might contest the legality or justice of any sale. Sales of land under these acts ended in 1846.

In 1853 four cases were decided by the Supreme Court of Appeals of Virginia, touching matters involved in sales of forfeited and delinquent lands. These cases are *Staats* v. *Board*, 10 Gratt. 400; *Wild's Lessee* v. *Serpell*, 10 Gratt. 405; *Hale* v. *Branscumb*, 10 Gratt. 418; and *Smith* v. *Chapman*, 10 Gratt. 445. They held that forfeitures to the Commonwealth became complete and absolute by operation of law, under the statutes mentioned above, and in *Smith* v. *Chapman, supra*, it was held that a proceeding in the superior court of law and chancery, in which such

land was sold for the benefit of the school fund, "is one in the nature of a judicial proceeding, and the orders and decrees of the court made in it are conclusive at least upon strangers." This holding was recognized by this Court in *Strader* v. *Goff*, 6 W. Va. 257. In *Holly River Coal Co.* v. *Howell, supra,* this Court held that the proceedings under the Virginia acts were judicial, and that when a sale was complete thereunder, it was *prima facie* evidence of forfeiture against all persons and conclusive against strangers in all collateral proceedings.

Thus the law stood at the date of the formation of this State. Article IX of our Constitution of 1863, relating to forfeited and unappropriated lands, provided by Section 1 that private rights and interests in lands shall be determined by the laws theretofore in force in the State of Virginia, and Section 2 provided that no entry by warrant on lands should be thereafter made. The Legislature was required to provide for the sale of all lands theretofore forfeited to the State of Virginia for nonpayment of taxes, and for nonentry, or waste and unappropriated lands, by a proceeding in the circuit court of·the county where such lands were situated. Tax charges not exceeding twenty dollars, or nonentry of any tracts of land of less than one thousand acres, were released from sale or forfeiture; and it was provided that other lands might be redeemed within five years from the date of the effective operation of the Constitution, and if not redeemed should be sold as provided in the preceding section of said article. It was further provided that a former owner of such lands should be entitled to the excess of the sum for which it was sold over and above taxes, damages, and costs, if claim therefor was filed in the circuit court within two years after such sale. Chapter 105, Code, 1868, is based on the Constitution of 1863. The appointment of a commissioner of school lands in each county was provided for, and he was required to make report of forfeited and delinquent lands to the circuit court, whose duty it was to direct sale of such lands.

Article XIII of the Constitution of 1872 covers the subject of land titles, and we are concerned here with Sections 4 and 5 of Article XIII, which we quote:

"4. All lands in this State, waste and unappropriated, or heretofore or hereafter for any cause forfeited, or treated as forfeited, or escheated to the State of Virginia, or this State, or purchased by either and become irredeemable, not redeemed, released, transferred or otherwise disposed of, the title whereto shall remain in this State till such sale as is hereinafter mentioned be made, shall by proceedings in the circuit court of the county in which the lands, or a part thereof, are situated, be sold to the highest bidder.

"5. The former owner of any such land shall be entitled to receive the excess of the sum for which the land may be sold over the taxes charged and chargeable thereon, or which, if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve per centum per annum, and the costs of the proceedings, if his claim be filed in the circuit court that decrees the sale, within two years thereafter."

The Legislature by Chapter 134, Acts 1872-3, provided for the sale of delinquent and forfeited lands under the Constitution of 1872. This statute does not differ materially from Chapter 105 of the Acts of 1868, except that it adds sections protecting the rights of former owners to the surplus derived from the sale of lands for the benefit of the school fund, as provided for in Section 5 of Article XIII of the Constitution. This act was interpreted in *McClure v. Maitland, supra,* decided in 1884, wherein was passed upon a sheriff's sale of delinquent lands made in November, 1875. In 1879, McClure, commissioner of school lands for Wyoming County, filed in the circuit court of that county, a report setting out the sale, purchase by the State, and nonredemption of certain lands sold in the names of Maitland and Jackson. The circuit court directed

process to issue against Maitland and others named in the petition, and proceedings were prosecuted to a point where the land in question was sold. Seeking relief from the circuit court's final decree, Maitland sought and was granted an appeal to this Court, and upon final hearing the appeal was dismissed as improvidently awarded, and the following holdings made:

"The proceedings provided by chapter 134 of the Acts of 1872-3 for the sale of lands for the benefit of the school fund are not judicial proceedings in the sense that they involve litigation between contesting parties; nor are they proceedings technically either *in rem* against the land, or *in personam* against the former owner of the land; but are in their character administrative, being simply a mode prescribed by the State for the sale of lands, which are her absolute property, and in the sale of which she alone is interested.

"The effect of section 5 of article XIII of the Constitution of this State, giving to the former owner the surplus proceeds of the land over the taxes, &c., does not confer upon him any interest in the land or right to participate in, or be a party to, the proceedings for the sale of it. The grant to him of such surplus proceeds is wholly gratuitous, and his claim thereto is confined to the proceeds as such and he can obtain them only in the manner prescribed by law.

"The former owner, having no interest in the land or the proceedings for its sale, is not entitled to be a party to the proceedings for the sale in the circuit court, and he, consequently, cannot appeal to this Court."

The proceedings for the sale of lands for the benefit of the school fund, provided for by Chapter 134 of the Acts of 1872-3, are not materially different from the statutes under which such lands were sold in Virginia, prior to the decisions of the Supreme Court of Appeals of that state cited above. The holding in *McClure* v. *Maitland,* represents a distinct departure from the holding in *Smith*

v. *Chapman, supra*. In the Virginia cases the sale proceeding was considered judicial, while in the *McClure* case it is held ex parte and administrative. In the *McClure* case, courts are treated as the agent of the State, and it is stated that the State could have established any other agency for the disposal of her lands having no connection with the courts.

*McClure* v. *Maitland* was, of course, decided under the provisions of Chapter 134, Acts 1872-3, although the decision came more than two years after that statute was amended and reenacted. On March 18, 1882, the Legislature enacted a statute which made vital changes in the existing statute. Chapter 95, Acts 1882. It undoubtedly made the proceeding for the sale of lands for the benefit of the school fund a judicial one, for by Section 5 it provided for the filing of a petition in the circuit court by the commissioner of school lands, in which he was required to furnish a description and other and full information relating to the title of the land involved, its quantity and probable value, and especially the names of any claimants thereto. Upon the filing of this petition, the parties affected thereby were required to be summoned to appear before a commissioner in chancery, and to show cause why the land proceeded against should not be sold for the benefit of the school fund. The petition was required to be referred to a commissioner in chancery, and upon his report the court was authorized to direct a sale of the lands found subject to sale. Provisions were made for the protection of the rights of the former owner to any surplus derived from any sale made. This act was amended from time to time, but its fundamentals remained in force for more than fifty years, and for that period represented the fixed policy of the State.

It is clear that the proceeding provided for in the act of 1882 was judicial. It has been so held by this Court. *Holly River Coal Co.* v. *Howell, supra; Hays* v. *Camden,* 38 W. Va. 109, 18 S. E. 461; *Moore* v. *McNutt,* 41 W. Va. 695-702, 24 S. E. 682. It is apparent the Legislature held the

view, in which we concur, that the proceeding for the sale of land for the benefit of the school fund, provided for in Section 4 of Article XIII of the Constitution, was intended to be judicial, and the act translated that view into statute law. It represents a construction of the constitutional provision different from that employed in *McClure v. Maitland,* and is a construction which prevailed for nearly sixty years following the act of 1882. We consider this construction as the settled policy of the State, based upon constitutional requirements, sound public policy, and clear reasoning, and a construction from which, because of the probable effect of any change on land titles, it would be dangerous to depart, even if the power to do so existed. But, as we have stated above, under the Constitution, any proceeding in the circuit court, or in this Court, must be judicial in its nature. This being true, and the Constitution requiring forfeited and delinquent lands to be sold in a proceeding in the circuit court, it necessarily follows that such proceeding must be a judicial one. True, the State might, in her Constitution, have provided for a proceeding for the sale of her lands ex parte and administrative in its nature, having no connection with her courts, but she has not done so. Under our Constitution, she can only employ the functions and processes of the courts in their capacities as judicial bodies, and when, through the Legislature, the State attempts to impose upon the courts duties which may be fairly termed non-judicial in their nature, she mistakes the method which should be employed to effect that purpose. The imposition of such duties on the courts can only be accomplished by an amendment to the Constitution.

Is a judicial finding that there has been actual vesting of title in the State by forfeiture, sale or escheat, or that the land sought to be sold is waste and unappropriated, a condition precedent to the entry of an order or decree for its sale? We think it is. *Twiggs v. Chevallie,* 4 W. Va. 463, was decided in 1871. The land in controversy in that suit was granted to John Strobia, in 1788, and in 1812 Strobia's

heirs conveyed the same to Gallego and Chevallie, who paid the taxes thereon from 1814 to 1842. It was never entered on the land books in the name of Strobia, and was sold as forfeited land in a proceeding instituted by a commissioner of forfeited and delinquent lands in 1839, and purchased by one Joseph Weirick, to whom it was conveyed in 1840, and his grantees claimed the land under his purchase as against the title claimed to have been vested in Gallego and Chevallie, under their conveyances and subsequent payments of taxes. In an action of ejectment to recover the land from Weirick's grantees, it was contended there never had been forfeiture of the Strobia title, and that notwithstanding the proceeding in 1839, under which Weirick's grantees claimed title, the deed to Weirick vested no title in him, and that the plaintiffs were entitled to recover. On a demurrer to the evidence interposed by the defendant, the trial court found for the plaintiffs, and its action was affirmed by this Court.

The decision in that case rested on the proposition that no forfeiture of the Strobia title had been shown, notwithstanding the proceeding in 1839. In reaching its conclusion, this Court said, as a part of the syllabus: "* * * the jurisdiction of the court ordering a sale of the land, was a limited one and only extended to the lands that were actually forfeited, and was based upon the report of the commissioner who was required to report the lands that were delinquent, and none other. Therefore no sale of land thereunder not actually forfeited, could divest *bona fide* owners"; and in the body of the opinion it is stated:

> "But the vital inquiry is, did the decree and proceedings have the effect to divest the rights and title of Gallego and Chevallie, then the rightful owners of the land in question? If they did, then the judgment complained of is erroneous. But if they did not have that effect, it is clearly right. Now, the jurisdiction of the court in the premises, it may be observed, was a limited and special jurisdiction, conferred by the statute over

a particular subject, namely, lands that were actually forfeited. It did not extend to lands not forfeited. The action of the court in such cases is founded on the report of the commissioner, who was required to report the lands that were delinquent and forfeited, and *none other*. If, therefore, the construction contended for was to prevail, it is evident the title to land, in many instances, would rest on no better foundation than the *opinion* of the commissioner of forfeited and delinquent lands. Such a construction would afford no protection to the citizen, and would tend to unsettle many of the land titles of the county otherwise perfectly good; and to so hold, it seems to me, would be to the last degree, harsh and unwarranted, by any principle of law or justice."

In *State* v. *Sponaugle,* 45 W. Va. 415, 32 S. E. 283, 288, 43 L. R. A. 727, Judge Brannon, speaking for the Court said:

"Can it, indeed, be said that the owner has irretrievably lost his land, without a hearing to contest the forfeiture? It is beyond doubt that the state has power to forfeit land, and vest title in itself, for delinquency or nonentry for taxes, if it leave a door open for hearing. If the Constitution had declared a forfeiture, and expressly given a hearing, no question could arise. It has declared a forfeiture, and has not shut the door against the owner to contest it. It simply declares that, if a fact exist, forfeiture ensues, as a legal consequence. It only says that a certain offense shall involve a certain penalty. All criminal or penal laws do this, but final conviction and penalty are to come after trial. It seems to me that we cannot consider the clause invalid, when privilege of contestation is not denied. Under the law before the act of 1882, a decree in a proceeding to sell land as forfeited was, while conclusive upon strangers, only *prima facie* evidence of forfeiture as against the owner. * * * In fact *Twiggs* v. *Chevallie,* 4 W. Va. 463, holds the jurisdiction as limited and special, and based only on forfeiture; and, if the land was not in fact forfeited, the decree would be void."

In *Webb* v. *Ritter*, 60 W. Va. 193, 231, 54 S. E. 484, discussing the question of forfeiture, this Court said:

"Whether he has title or not depends upon the existence or non-existence of the cause of forfeiture specified. The determination of that question is left to the courts. Neither the constitution nor the legislature has attempted to vest in any ministerial or executive officer the power to foreclose that question. The question of forfeiture is never settled conclusively as between the State and the former owner, or between the latter and a grantee of the State, or a claimant of the title by transfer, except by the adjudication of a court of competent jurisdiction, and never was intended to be. Therefore, neither the Constitution nor any statute attempts to declare an absolute and conclusive forfeiture except by the adjudication of a court after a full opportunity to be heard. This view of the forfeiture clause makes it absolutely invulnerable to the charge of want of due process of law."

Other discussions in the opinion sustain these propositions, and, of course, these principles apply to cases depending upon purchases by the State at tax sales.

We think these cases establish the proposition that the first necessary step in any proceeding to sell lands for the benefit of the school fund is a finding that the land sought to be sold is, in fact, subject to sale. A patient search of the authorities discloses nothing contrary to that view. That the Legislature had in mind the undoubted fact that many tracts which the circuit court, under Article 4, Chapter 117, was required to order sold were not, in fact, subject to sale, is attested by the many provisions in the act under which this question might be determined. The act throughout shows a commendable purpose to give former owners and other claimants an opportunity to test this question. The weakness of the act is that it does not provide for any notice, or for any opportunity to test this question before sale, and we think that due process, and provisions of our Constitution require such notice and op-

portunity. It may be said that the sale is not completed when the offer is made to sell and bids accepted; that the sale must be confirmed—true—but the offer and acceptance of bids vest in the purchaser certain rights and put on the former owner the burden of establishing that the land sold was not subject to sale. It represents a judgment before trial, and this is contrary to all sound principles of Anglo-Saxon law. The act goes to the extreme limit in affording opportunities to avoid the effect of sales, even to the extent of permitting suits to set aside deeds to purchasers, if instituted by persons who have had no notice of the proceeding in which the sale was made, and if instituted within one year after the confirmation thereof. Why not notice in the first instance? If given, then, when sale is made, there would be an end to the matter. The solid foundation upon which the jurisdiction of any court rests, is notice to the parties against whom relief is sought, or whose rights are under attack. We cannot be wrong when we require strict adherence to this ancient and time-honored principle.

Other than the failure of the act to require a finding that the land sought to be sold is, in fact, subject to sale, we find no fault with its provisions with respect to the right of the former owner to the surplus remaining from the sale price, after taxes and costs are paid. This right does not affect the title to the land. The surplus is personal property and subject to execution. *Wiant* v. *Hays,* 38 W. Va. 681, 18 S. E. 807, 23 L. R. A. 82. But we think this right in the former owner, being constitutional under Section 5, Article XIII, furnishes a basis for the claim that the former owner is entitled to have the land, out of which he may expect something from the surplus, sold under the most favorable conditions. The general rule, as is well known, is that real estate is not usually sold in a judicial proceeding until the liens thereon are first ascertained and decreed; and that is a rule that may well be applied in the sale of land for the benefit of the school fund, to the extent that all questions of the right to sell

the land be settled in advance of sale. The absolute right of the State to sell lands as forfeited and delinquent is, we think, limited to this extent and so limited by the Constitution.

We now come to the third question. Section 4 of Article XIII of the Constitution requires the sale of certain specified lands, the title to which has become vested in the State, through a proceeding in the circuit court of the county in which the lands are situated, and to the highest bidder. We think the act does not violate the Constitution, when it provides that if no one bids the amount of taxes and costs chargeable against a tract, the deputy commissioner shall purchase such lands for the Public Land Corporation. We see no constitutional impediment to the formation of a corporation by the State, for governmental purposes only. This has been done in numerous instances, one example being the state road commission. The State cannot become a shareholder in a private corporation. Constitution, Article X, Section 6. We do not think the creation of a public corporation for purely governmental purposes comes within the inhibitions of Section 1, Article XI of the Constitution, requiring corporations to be created under general law. This section, we think, was intended to apply to private corporations.

The act by which the Public Land Corporation of West Virginia was created, Chapter 54, Acts, First Extraordinary Session, 1933, provides: "The corporation shall be vested with the title of the state in public lands, the title to which now is or may hereafter become absolutely vested in the state of West Virginia by reason of any law governing the title to lands within the state".

The corporation is the creature and arm of the State, established for a governmental purpose. If not, it has no legal existence, because created by special act. If the creature and arm of the State, it cannot be sued. Constitution, Section 35, Article VI; *Mahon v. Road Commission,* 99 W. Va. 397, 129 S. E. 320; *Stewart v. Road Commission,* 117 W. Va. 352, 185 S. E. 567; *Watts v. Road Commission,*

117 W. Va. 398, 185 S. E. 570. The Legislature has no power to permit such a suit.

When the public land corporation purchases land at a sale made by a deputy commissioner, the land purchased becomes the property of the State to the same extent as if the purchase had been made in the name of the State. We do not have to go behind any corporate veil to reach this conclusion. Therefore, at the end of the proceeding, the State is exactly where it was at the beginning—the owner of the land. Section 4 of Article XIII provides how such land must be disposed of by the State, so that proceedings for its sale will have to be repeated *ad infinitum*, unless, perchance, someone other than the State is willing to bid the amount of taxes and costs. We see no escape from the conclusion that as to lands purchased by the Public Land Corporation, they must again be sold under Section 4 of Article XIII of the Constitution. This is in harmony with what has always been the expressed policy of the State, namely, to keep its territory in private, as distinguished from public, ownership, to the end that revenues for public purposes may be secured through taxation therefrom, and the land employed for useful purposes in the economic development of the State.

In view of the peculiar importance of the questions discussed in this opinion, as bearing upon titles to lands within this State, we do not deem it inappropriate to refer to some consequences which might flow from the administration of some of the features of the act under consideration.

Under Chapter 95 of the Acts of 1882, and amendments thereto, there was gradually developed a theory that, under sales provided for therein, the purchaser acquired not only the title of the former owner, for whose default such title became vested in the State, but the title vested in the State from whatever source derived, and the State estopped from again selling the land under any other title than vested in it. Such sale was also binding upon all other claimants, provided they had been made parties to the sales proceeding, under provisions of the act, and had

been given their day in court. *State v. Jackson,* 56 W. Va. 558, 49 S. E. 465; *State v. Harmon,* 57 W. Va. 447, 50 S. E. 828; *State v. Mathews,* 68 W. Va. 89, 69 S. E. 644; *State v. West Branch Lumber Co.,* 64 W. Va. 673, 63 S. E. 372. While not questioning the power of the Legislature to do so, it should be stated that under Article 4, Chapter 117, Acts 1941, this rule is expressly abrogated. Now, under the sale provided for therein, the purchaser only gets the title of the former owner. The effect of this change on the settlement and security of land titles in this State is not difficult to foresee.

Our policy, and that of Virginia, of forfeiting lands for nonentry on the land books of the county for tax purposes, has been subject to attack as a deprivation of property without due process of law. Many cases, both in Virginia and this State, sustain the policy. Judge Brannon in *State v. Sponaugle, supra,* discusses the question and refers to many cases. It was upheld by the Supreme Court of the United States in *King v. Mullins,* 171 U. S. 404, 18 S. Ct. 925, 43 L. Ed. 214. In that case, Chapter 105 of the Acts of 1887, in which was incorporated Chapter 95 of the Acts of 1882, is fully discussed, and the provision as to notice, hearing, and the protection accorded former owners as to the surplus, derived from any sales of land thereunder, are relied upon to combat the theory of lack of due process of law. Without such provision for notice and hearing, the holding of the Court might have been different. Judge Brannon, in discussing the *King* case, and in referring to the forfeiture clause of our Constitution says: "I shall not say that the opinion holds that clause, taken alone, valid, though it virtually does so. The opinion holds that as, in connection with the state constitution, the statutes to sell land as forfeited give the owner a hearing, 'there is no ground for him to complain that his property has been taken without due process.' "

The present act provides for notice after sale. The statute in effect when the *King* case was decided provided for notice and hearing before sale. Aside from the constitutional question involved, is it wise to enact laws

under which the constitutionality of our forfeiture system may again be subjected to attack?

With few exceptions, the duties ·imposed on circuit courts under Article 4, of Chapter 117, Acts of 1941, are administrative in character, and certainly the duties sought to be imposed by the writ prayed for are such. This, in itself, requires us to deny the writ. Further, we are of the opinion that the proceeding in the circuit court for the sale of lands for the benefit of the school fund under Section 4 of Article XIII of the Constitution, must be a judicial proceeding; and that before sale of land may be ordered, there must be a judicial finding that the title to the land sought to be sold is, in fact, vested in the State, and therefore subject to sale. We are also of the opinion that the sale of any of such lands to the Public Land Corporation of West Virginia is, in fact, a sale to the State, and that under Section 4 of Article XIII, the State cannot divest itself of such title, except by the proceeding therein provided for.

We do not mean to hold the entire act unconstitutional. The provisions therein with reference to the creation of the officer of commissioner of forfeited and delinquent lands, and his deputies in the several counties of the State, and for the certification of delinquent and forfeited lands to the circuit courts of the counties, and which provide the method by which lands may be redeemed from the deputy commissioners, are valid exercises of legislative powers, and are not meant to be disturbed by our decision. Many other provisions of the act relating to confirmation of sales, conveyance of lands, and other provisions, carrying sales into effect, are well designed for the purposes in mind, provided there has been a judicial ascertainment of the right to sell the land proceeded against before the order for their sale has been entered. Had the statute contained a provision for judicial ascertainment that the lands proceeded against were, in fact, subject to sale, it would have made the proceeding a judicial one, and the defects we now find in the act would have no existence. We do nothing more

than find the act unconstitutional, first, so far as it fails to provide for a judicial ascertainment, prior to any order of sale, that lands proceeded against are, in fact, subject to sale; and, second, because as the act now stands it attempts to impose upon circuit courts administrative powers, in connection with such sales, in violation of the several constitutional provisions to which we have referred.

The writ of mandamus prayed for is denied.

*Writ denied.*

KENNA, JUDGE, concurring:

I am in full accord with the conclusion reached in the majority opinion, but I believe that from a practical, as well as from a sound theoretical, standpoint, the unavoidable result should be to expressly overrule the holding of this Court in the case of *McClure* v. *Maitland,* 24 W. Va. 561. In so doing I would not be disturbed by the fear that land titles in this State might, or could, be upset to an appreciable extent by the entire elimination of a legal principle upon which they may be founded, because I regard this as one of the extremely rare occasions which justify the exercise of the principle commonly known as the "Rule of Property", the effect of which is to prevent the findings of a court of last resort from operating retroactively so as to disturb titles acquired under a former well-established rule in conflict therewith. See *Gelpcke* v. *City of Dubuque,* 68 U. S. 175, 1 Wall. 175, 17 L. Ed. 520; and 18 Columbia Law Review, 230. To state it shortly, I would maintain titles acquired under the rule laid down in the *Maitland* case when that case was recognized as establishing the rule in West Virginia. I would say positively, however, that from now on that case establishes no binding rule in this State.

As I understand the holding of this Court in the *Maitland* case, it was that a school commissioner's proceeding for the sale of delinquent and forfeited lands was administrative, and that the person in whose name the land

was last charged on the land books prior to its forfeiture for nonentry, or in whose name the delinquency, under which the State acquired title, occurred, although included in an order of publication and actually appearing, had no appealable right and hence the review was improvidently granted upon their petition, it not being a judicial proceeding.

At the time that this State was formed, the Virginia Act of February 13, 1844 (Acts 1843-44, c. 19), was in effect, and under its provision any person interested could file a petition in three years contesting the validity of a sale or order of sale, or the fact that the land in question was subject to sale, and thereupon proceedings were required as upon a bill in chancery, with the right to appeal expressly granted to any party in interest. See Harlow on "Delinquent and Forfeited Lands" at page 68, cited in the *Maitland* case at page 574.

It is true, as stated in the *Maitland* opinion, that by adopting Virginia statutes, referring expressly to the Acts of 1837 and 1838, under a general rule of construction, unless otherwise stated, this State also adopted the Virginia interpretation and construction. However, I think that it is unnecessary to invoke that general principle since Section 8 of Article XI of our Constitution of 1863 reads in part as follows: "Such parts of the common law and of the laws of the State of Virginia as are in force within the boundaries of the State of West Virginia, when this Constitution goes into operation, and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the Legislature. * * * " In so far as the title to land is concerned, to the same effect is the express provision of Section 1, Article XIII of our present Constitution. In the light of that express provision it is unnecessary to invoke a general rule of construction involving the same principle. Furthermore, in the light of that express wording, the statement in the *Maitland* opinion at the top of page 575 to the effect that the Virginia Act of February 13, 1844, has been entirely omitted from both the constitu-

tional and statutory provisions of this State, is quite inaccurate.

Remembering that we adopted the laws of the State of Virginia by our Constitution of 1863, we must not lose sight of the fact that when our constitutional provision requiring a proceeding in the circuit court to dispose of delinquent and forfeited lands held by the State was adopted, the Virginia Act of February 13, 1844, conferring upon the former owner a right to contest the validity of a sale by a proceeding "as upon a bill in chancery" was in effect. That Act was the only method expressly provided for testing a forfeiture. It was not done by an *ex parte* administrative proceeding in court. The Act created a plainly judicial method. If the only method provided for contesting the validity of a sale in the circuit court was a judicial proceeding, then the expression "by proceedings in the Circuit Courts" as used in Section 4, of Article 13 of our Constitution of 1872 was to my mind plainly misapplied in the *Maitland* case. That the nature of a duty required of a judicial body should, in case of doubt, be held to be administrative seems decidedly strained.

For the foregoing reasons I would expressly overrule the case of *McClure* v. *Maitland,* 24 W. Va. 561, because I do not regard the position taken by the Court therein as sound, and would restrict the alteration of principle to its prospective effect.

I agree that the Act under consideration is unworkable upon any sound constitutional theory.

I am authorized to say that Judge Rose concurs in this opinion.