STATE OF WEST VIRGINIA

*v.*

JERRY M. GRAY, *et al.*

(No. 10113)

Submitted February 1, 1949.   Decided

March 8, 1949.

LOVINS AND RILEY, JUDGES, concurring.

*Ira J. Partlow,* Attorney General and *John C. Vance,* Assistant Attorney General and *J. M. Hoover,* for appellant.

*Wolverton & Callaghan,* and *Wysong & Wysong,* for appellees.

Fox, Judge:

On July 28, 1948, the State of West Virginia, by John M. Hoover, Deputy Commissioner of Forfeited and Delinquent Lands for Webster County, West Virginia, filed a bill in equity in the Circuit Court of said county, seeking the sale of twenty-four separate lots and parcels of land, alleged in the said bill to have been sold by the sheriff of said county during some of the years from 1922 to 1943, both inclusive, purchased for the State of West Virginia, and not redeemed, and which it was alleged had become irredeemable, and, therefore, subject to sale under Section 4 of Article XIII of the Constitution of this State. The proposed sale was to be made for the benefit of the school fund, Section 4 of Article XII of the said Constitution providing that the proceeds of such sale be paid into the school fund. Said suit was instituted under the provisions of Chapter 160, Acts of the Legislature, 1947.

The bill avers the election and qualifications of Edgar B. Sims, as Auditor of the State of West Virginia, and his status as ex officio Commissioner of Forfeited and Delinquent Lands for said State; and the appointment

and qualifications of John M. Hoover, as Deputy Commissioner of Forfeited and Delinquent Lands for Webster County, of said State. The bill then alleges:

"Third: That on the 15th day of June, 1946, the said Auditor of said state certified to the Circuit Court of Webster County, West Virginia, as required by law, a list of all lands in said Webster County which were forfeited, delinquent, waste and unappropriated or escheated, and forwarded a copy of such certification to his said Deputy, John M. Hoover, which was duly received.

"Fourth: That within ten days after receipt of said certified list by said Deputy from the said Auditor, the said Deputy Commissioner prepared and caused to be published and posted, as required by law, a notice to redeem.

"Fifth: That said certified list is exhibited herewith and is hereby made a part of this Bill.

"Sixth: That the following described tracts or lots of land, so certified, have become irredeemable, have not been redeemed or released, the title thereto remains in the State, and each is subject to sale for the benefit of the School Fund; that the certification number, and, as to delinquent and forfeited land, the year sold or forfeited, the name of the former owner in which sold or forfeited, the location and description of each tract or lot of land herein, proceeded against, whether such tract or lot of land is forfeited, delinquent, escheated or waste and unappropriated, and the total amount due with respect to each tract or lot of land proceeded against herein, are respectively, as follows: that is to say: "

The bill then proceeds to separately list the several tracts and parcels of land proceeded against, under the head of the certificates mentioned in paragraph 6 of the bill. These certificates are numbered 319, 326, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 337, 339, 340, 254, 255, 256, 257, 258, 259, 260, 264, and 265.

Plaintiff asked that the suit be dismissed as to tracts numbered 258 and 331, for reasons set out in its bill. It appears from the said bill that tract number 336 was sold by the sheriff in the year 1942, presumably for the taxes of the year 1941; that tract numbers 339 and 340 were sold in 1943, presumably for the taxes of the year 1942; and it is then alleged therein that no taxes had been extended or paid on the other tracts so listed and certified.

The prayer of the bill reads as follows:

"Plaintiff, therefore, prays that the persons named in the caption hereof be made parties defendant to this suit; that process issue against the several defendants hereinbefore named; that an order of publication may be awarded and completed as to all unknown parties and claimants who have or claim an interest in the lands proceeded against herein, and that all the right, title and interest of such of them as fail to appear herein and defend their interests be forever foreclosed and held for naught; that a suitable person be appointed guardian ad litem for any infant defendants proceeded against herein, whether known or unknown, and for all unknown persons, firms and corporations, if any; that the rights of the defendants, respectively, in and to any tract or lot of land proceeded against herein may be adjudicated and determined; that it be found and adjudged by the Court that the title to each said tract or lot of land included in and proceeded against in this suit is now unqualifiedly vested in the said State, and that each such tract or lot of land is subject to sale for the benefit of the School Fund, that, should an appropriate occasion arise under Code 11A-4-20, as to any tract or lot of land proceeded against herein, then a decree of reference as to it may be made to one of the Commissioners in Chancery of this Court for such report as the Court may direct; that the Court may permit the dismissal of this suit as to any tract or lot of land herein proceeded against pursuant to the provisions of Code 11A-4-19; that

a decree be entered herein authorizing and directing that each of the tracts or lots of land herein proceeded against be sold for the benefit of the School Fund, as provided by law; and that the plaintiff may have such other, further and general relief in the premises as shall seem meet and proper."

On July 27, 1948, an order of publication was entered in said suit, in the office of the Clerk of the Circuit Court of Webster County, which contains the following statement of the purposes of the suit:

"The object of the above-entitled suit is to obtain a decree of the Circuit Court of Webster County, ordering the sale, for the benefit of the School Fund, of all lands included in the suit, and for general relief. The following is a list of all such lands, setting forth as to each item its local description, the former owner in whose name the land was forfeited, or was returned delinquent and sold:"

The lots and parcels of land proceeded against were then listed under their certification number, aforesaid, and in conformity with the above quoted statement of the object of the suit. The order then ends with the following:

"The above named defendants, to wit: (again naming each of the defendants), and all unknown parties who are or may be interested in any of the land included in the suit are required to appear within one month after the date of the first publication hereof, and do what may be necessary to protect their interests."

This order of publication was published for three consecutive weeks, commencing August 4 and ending August 18, 1948, in two weekly newspapers published in Webster Springs, the county seat of Webster County.

On September 17, 1948, the defendants, Lillie B. Hill and B. F. Brown, made a general appearance in the

cause, and filed their separate demurrers to the plaintiff's bill. These demurrers are in identical form, except as to the names of the parties filing the same, and read as follows:

"1. The bill is without equity.

"2. The Act of the West Virginia Legislature, Regular Session, 1947, under which this suit is prosecuted, is unconstitutional and violates both the Constitution of the State of West Virginia, and the Constitution of the United States and violates the rights of the defendant in that and in other respects and is null, void and of no effect.

"3. The Court is without jurisdiction to entertain this suit or to decree upon the matters set up in the bill.

"4. And for other reasons apparent on the face of the bill.

"The said defendant, therefore, prays the judgment of the Court whether he should be required to make any other defense to said bill."

The plaintiff joined in said demurrers, and the cause was submitted thereon. The order of submission, entered on the 17th day of September, 1948, reads:

"The Defendant, B. F. Brown and Lillie B. Hill this day appeared in Court and tendered and asked leave to file their respective separate demurrers in writing, and said demurrers being inspected by the Court are ordered filed; and are filed in the manner provided by law; and thereupon the plaintiff joins in said demurrers, and says the bill of complaint is sufficient in law; and the issue is accordingly thereon joined, and said demurrers having been set down for hearing in the Court were argued by counsel; and the parties agree that the disposition of the issues arising on said demurrers

shall be conclusive of the final determination of the cause, and that the Court, after deliberation on said issues, may enter any proper decree on the merits of the case after submitting the same to the counsel of record for each party, with full and free right to object and except to any final decree proposed to complete the adjudication of the case."

On October 2, 1948, the following decree was entered in the cause:

"The Court having maturely considered the questions arising in this cause submitted for final hearing by the order entered herein on the 17th day of September, 1948, is of opinion that the Act of the Legislature of 1948, Chapter 160, passed March 8, 1947, in so far as it respects lands purchased by the State, and the disposition thereof, violates the inhibitions of the Constitution of the United States, Article 1, Section 10 in the particular thereof which provides that no State shall pass any law impairing the obligation of contracts; and likewise violates the Compact of the Commonwealth of Virginia with this State in denying the owners of lands lying in West Virginia the security provided for therein for the benefit of their titles; and for the reasons above assigned and other reasons arising on the record, the Court finds and determines, adjudges, orders and decrees that said Act of 1947, Chapter 160, in so far as it concerns sales of lands purchased by the State at tax sales or any dispensation thereof by proceedings in this Court, is void and wholly insufficient to support any sale contemplated under the Constitution of this State, Article XIII Section 4, the sole repository of Jurisdiction in this Court to make such dispositions.

"It is accordingly adjudged, ordered and decreed that the demurrers of the defendants to the plaintiff's bill, be and the same is, sustained, and the relief prayed for in the bill denied. And nothing further appearing in delay of final

decree, it is accordingly adjudged, ordered and decreed that plaintiff take nothing by her suit, and the bill of complaint be dismissed.

"And the Court being of opinion that said cause is not maintainable against other parties to the cause than those appearing, doth dismiss said bill as to them for want of any jurisdiction to proceed thereof.

"The reasons and conclusions of the Court in arriving at its decision are stated in a printed opinion of the Court, endorsed by the Clerk as 'filed in the proceedings' and made a part of the record of this cause.

"The plaintiff before the foregoing decree was directed by the Court objected to the same; which objections before stated were overruled, and on his motion it is adjudged, ordered and decreed that the decree herein is suspended for sixty days to enable the plaintiff to apply to the Supreme Court of Appeals for an appeal."

On November 8, 1948, at the instance of the State, we granted this appeal.

There was filed with the decree, and made a part of the record, the opinion of the trial judge, to which, in view of the importance of the question involved, and our respect for the source of the views therein expressed, we have given mature deliberation.

The decree appealed from speaks for itself, but it may be said to be based on two propositions of law: (1) That Chapter 160 of the Acts of the Legislature, 1947, violates Section 10 of Article I of the Constitution of the United States, and in particular that part thereof which provides that: "No state shall * * * pass any * * * Law impairing the Obligation of Contracts * * *."; and (2) that said Act violates what is termed in said decree a compact between the Commonwealth of Virginia and the State of West Virginia, in respect to se-

curity of titles to land within the boundaries of this State, based upon acts of the Commonwealth of Virginia prior to the formation of this State. This opinion will be restricted to the discussion of these two propositions, with reference to such other matters only as may be necessary to cover the issue covered by the pleadings, the trial court's decree, and its opinion in the cause. The theory of the compact mentioned in the decree below will be first considered.

We need not devote time or space to discussing the causes of, or the methods employed, in effecting the separation of what is now the State of West Virginia from the Commonwealth of Virginia. Suffice to say, that it was preceded by the organization of what is known as the Restored Government of Virginia, which operated from the City of Wheeling. Delegates were elected to a convention which met in Wheeling in June, 1861, and at said convention a Governor and other State officials were elected, and thereafter assumed to exercise the power of government throughout the Commonwealth of Virginia, but as a practical matter only that part thereof which was in possession of Federal authorities. Such convention assumed the functions of a Legislature or Assembly, and had been selected by the voters of the western part of Virginia in the spring of 1861. Following the election of State officials, a movement to organize a new State began. On August 20, 1861, the Wheeling Convention or assembly adopted an ordinance providing for the formation of the new State out of the territory of the Commonwealth of Virginia. We are only concerned with that part of Section 9 of said Ordinance which relates to the security of land titles, and to the taxation of lands, which reads:

> "All private rights and interests in lands within the proposed State, derived from the laws of Virginia prior to such separation, shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in the State of Virginia.

> "The lands within the proposed State, of non-resident proprietors, shall not in any case be taxed higher than the lands of residents therein. No grants of lands or land warrants, issued by the proposed State, shall interfere with any warrant issued from the Land Office of Virginia prior to the 17th day of April last, which shall be located on lands within the proposed State now liable thereto."

Following the adoption of this Ordinance, provision was made for the selection and organization of a convention to form a constitution for the proposed new State. This convention met in Wheeling on November 26, 1861, and remained in session several weeks. A proposed constitution was formulated by said convention and submitted to the voters within the territory of the proposed new State, at an election held on May 3, 1862, and was ratified or adopted. On May 13, 1862, the Legislature of the Restored Government of Virginia gave its consent to the formation of the new State; and on December 31, 1862, the new State was admitted into the Union by an act of the Congress of the United States. Said act contained a provisional condition which, apparently, the new State met, and, as the act authorized, the new State came into being by proclamation of the President of the United States on June 20, 1863.

In the constitution adopted in 1862, and which became effective on the admission of the new State into the Union on June 20, 1863, the subject of forfeited and unappropriated land was dealt with by Article 9 thereof. As a matter of history and because of its bearing on the issue of this cause, we quote the said article in its entirety. It reads:

> "1. All private rights and interests in lands in this State, derived from or under the laws of the State of Virginia, prior to the time this Constitution goes into operation, shall remain valid and secure, and shall be determined by the laws heretofore in force in the State of Virginia.

"2. No entry by warrant on land in this State shall be hereafter made; and in all cases where an entry has been heretofore made and has been or shall be so perfected as to entitle the locator to a grant, the Legislature shall make provision by law for issuing the same.

"3. The Legislature shall provide for the sale of all lands in this State heretofore forfeited to the State of Virginia for the non-payment of the taxes charged thereon for the year one thousand eight hundred and thirty-one, or any year previous thereto, or for the failure of the former owners to have the same entered on the land books of the proper county and charged with the taxes due thereon for the said or any year previous thereto, under the laws of the State of Virginia, and also of all waste and unappropriated lands, by proceedings in the Circuit Courts of the county where such lands are situated.

"4. All lands within this State, returned delinquent for non-payment of taxes to the State of Virginia since the year one thousand eight hundred and thirty-one, where the taxes, exclusive of damages, do not exceed twenty dollars; and all lands forfeited for the failure of the owners to have the same entered on the land books of the proper county, and charged with the taxes chargeable thereon since the year one thousand eight hundred and thirty-one, where the tract does not contain more than one thousand acres, are hereby released and exonerated from forfeiture, and from the delinquent taxes and damages charged thereon.

"5. All lands in this State heretofore vested in the State of Virginia by forfeiture, or by purchase at the sheriffs' sales for delinquent taxes, and not released or exonerated by the laws thereof, or by the operation of the preceding section, may be redeemed by the former owners, by payment to this State of the amount of taxes and damages due thereon at the time of such redemption, within five years from the

day this Constitution goes into operation; and all such lands not so released, exonerated or redeemed, shall be treated as forfeited, and proceeded against and sold as provided in the third section of this article.

"6. The former owner of any tract of land in this State sold under the provisions of this article, shall be entitled to receive the excess of the sum for which such tract may be sold over the taxes and damages charged and chargeable thereon, and the costs, if his claim be filed in the Circuit Court which decreed the sale, within two years thereafter."

A new constitution was formed later and adopted in this State in the year 1872, and in that constitution, the subject of land titles, was covered by Article XIII thereof. Section 2 of said Article provided that no entry by warrant on land in said State should be thereafter made. Section 3 thereof provided for the transfer of title of land, vested in the State by forfeiture or other specified manner, to persons who might by possession and the payment of taxes, or by connecting his title with the Commonwealth, and payment of taxes, become entitled thereto. Section 6 provided for the forfeiture of land for the failure to enter the same on the land books of the several counties for the purpose of taxation. Sections 3 and 6 are not here directly involved, but we think Sections 1, 2, 4 and 5 do have a direct bearing on this controversy and, therefore, we quote them as follows:

"1. All private rights and interests in lands in this State derived from or under the laws of the State of Virginia, and from or under the constitution and laws of this State prior to the time this constitution goes into operation, shall remain valid and secure and shall be determined by the laws in force in Virginia, prior to the formation of this State, and by the constitution and laws in force in this State prior to the time this constitution goes into effect.

"2. No entry by warrant on land in this State shall hereafter be made.

"4. All lands in this State, waste and unappropriated, or heretofore or hereafter for any cause forfeited, or treated as forfeited, or escheated to the State of Virginia, or this State, or purchased by either and become irredeemable, not redeemed, released, transferred or otherwise disposed of, the title whereto shall remain in this State till such sale as is hereinafter mentioned be made, shall by proceedings in the circuit court of the county in which the lands, or a part thereof, are situated, be sold to the highest bidder.

"5. The former owner of any such land, shall be entitled to receive the excess of the sum for which the land may be sold over the taxes charged and chargeable thereon, or which, if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve per centum per annum, and the costs of the proceedings, if his claim be filed in the circuit court that decrees the sale, within two years thereafter."

We have quoted from the Ordinance of 1861, and our Constitution of 1862 and 1872, to bring to the full light of day the documents on which is based the contention that the sovereign State of West Virginia is thereby limited and restricted in the steps it may take to collect the taxes it has lawfully imposed on its own territory. If that contention be sustained, we are not a sovereign State, because our power to sustain our government by taxation is substantially weakened. A state without the right to impose lawful taxes, and to enforce their collection lacks the essential power necessary to preserve its existence.

In rejecting this contention, as we do, we do not believe it necessary to go beyond the Ordinance and constitutional provisions quoted above. They each refer to

"private rights and interests in land", and do not by their terms, or by implication, deal with the State's undoubted right to tax land and other property, and to provide for the collection thereof. The purpose in mind at the time said instruments were adopted seems clear. We know, as a matter of history, that in those days political and sectional passions ran high. However, the leaders of the movement to organize the new State were honorable men, and apparently desired to guard against, first, any repudiation of the lawful acts of the old Commonwealth, with respect to land titles; and second, any discrimination against non-resident owners of land. Therefore, they provided against such dangers by the Ordinance of 1861. In the Constitutions of 1862 and 1872, they guarded against the first danger by incorporating therein the substance of the provision, in respect thereto, contained in the Ordinance; and against the second, by providing in both Constitutions that all taxes should be equal and uniform throughout the State. Whether said Ordinance and the constitutional provisions aforesaid, constituted a "compact" or whether, as we prefer to believe, they constituted an ex parte solemn undertaking on the part of the people of this State, is immaterial; the pledge or undertaking should be, and, in our opinion, has been, treated as binding, and has been redeemed in good faith. We agree that, whatever it was, the Constitution of the United States, Section 10 of Article I, inhibits the violation of the obligation thereof, not only under its own terms, but as such an obligation has been interpreted and supported by cases such as *Green v. Biddle*, 8 Wheaton 1; *Ogden v. Saunders*, 12 Wheaton 213-338; *Bronson v. Kinzie*, 1 Howard 311. What is material is to determine what the compact or undertaking was intended to cover, and what, by its terms or by its implications, it did cover. In our opinion, the State of West Virginia has fully met the intended purpose of the quoted portion of Article 9 of the Ordinance of 1861, by the constitutional provisions of 1862 and 1872. Of course, we must rest our opinion in this matter on the provisions of the Constitution of 1872. What

was contained in the Ordinance of 1861, and the Constitution of 1862, are considered as background in interpreting the force and effect of the present Constitution.

We can see nothing in the Ordinance and constitutional provisions, aforesaid, to support the theory that any limitation was intended to be placed on the right of the State of West Virginia to deal with its own territory, by way of taxes, or otherwise, so long as the provisions of the Federal Constitution were not violated. The sovereign right to tax would be worthless without the power to enforce the payment of the taxes imposed ; and the right to enforce the payment of such taxes necessarily carries with it the right to proceed against delinquents, either by creating a lien on the thing taxed, or otherwise, as the Legislature may prescribe. As is well known, the taxing power is vested solely in the Legislature, and so long as it does not amount to confiscation is virtually unlimited. It is inconceivable that the framers of our Constitutions, and the Ordinance of 1861, ever intended to surrender this power, so essential to the existence of the State they were then proposing to organize and establish.

Furthermore, when the Ordinance of 1861, and the Constitution of 1862, were formulated and adopted, it was not at all certain that the Commonwealth of Virginia and the proposed new State would be members of the same Union or Confederation of States. At that time the outcome of the war between the States was in doubt. A victory for the Confederate States would have firmly placed Virginia in that Confederacy, and a new nation would have been born. The paramount purpose of the organization of the new State of West Virginia was to hold it within the Federal Union, and this being true, how it is possible to conceive that the men who framed the Ordinance of 1861, and the Constitution of 1862, had it in mind to surrender a power, so important to the future of the proposed new State, to another state which, as the outlook then was, might be a member of a foreign, even hostile, nation. In our opinion, they did not so intend and they did nothing more than to

provide that titles to land, as they had been acquired at that date, should be tested by the then laws of Virginia; and that the lawful acts of that Commonwealth, in respect thereto, would not be repudiated by the new State. It is now contended that what they did was, not only that which we have stated, but further, that they surrendered to Virginia, or any one entitled to rely on said Ordinance and constitutional provisions, the right to have the laws of Virginia as they existed prior to 1861, in so far as they pertain to the sale of delinquent lands enforced for their benefit; and that this State may not pursue its own policy in respect thereto, so long as such policy conflicts with the laws of Virginia in respect thereto, as they existed in ante bellum days.

To show that no such result was intended, we have only to read the provisions of Article IX of the Constitution of 1862, and Article XIII of the Constitution of 1872. In both there is a marked departure from the laws of Virginia in respect to the sale and disposition of forfeited and delinquent lands. We need not go into detail, but a reading of Chapter 114 of the Code of Virginia, 1860, will disclose the extent of that departure. In discussing this point, Judge Poffenbarger, in *State v. West Branch Lumber Co.*, 64 W. Va. 673, 63 S. E. 372, said:

> "Chapter 114 of the Code of 1860 constituted the law on this subject at the time of the formation of this State. By the Constitution of 1863, that policy was very materially departed from. The provisions of that Constitution have practically no bearing upon this question. By the Constitution of 1872, the substance of these Virginia statutes was incorporated into the six short sections of Article XIII. That Article preserves, as did the Constitution of 1863, all rights acquired under the Virginia statutes, and those statutes remain to this day as muniments of title to lands in this state. The forfeiture policy of the Virginia law was inserted in section 6 of Article XIII of the Constitution and the transfer principles were embodied in section 3 of that article."

It would seem unreasonable to suppose that the framers of said Constitution intended, in the first sections of the Articles above mentioned, to tie this State to the laws of Virginia, as they existed in former years, and then by every other section of said articles make wholly different provisions for the sale of forfeited and delinquent lands. It is quite evident that they considered themselves free to exercise their judgment as to the proper procedure in a matter which had vexed the old Commonwealth, and continues to vex the new State to this day.

At this point, on the theory of contemporaneous construction, followed over a long course of years, we think, it is not improper to note that in all the litigations over land titles in this State, embracing every question which the minds of the great lawyers of the past could originate and present to our courts, from a date shortly after the adoption of the Constitution of 1872 to this day, the authority of this State to legislate, within the limits of the State and Federal Constitutions, on the subject of forfeited and delinquent lands, free from any supposed compact with the Commonwealth of Virginia, has not been questioned, until this suit was instituted. The question being raised more than three quarters of a century after the date when it might have been posed, and after this State has, for more than seventy years, under different statutes, disposed of forfeited and delinquent lands in a manner different from that authorized by the laws of Virginia prior to 1861, must, for the sake of the security of land titles in this State, be disposed of once and for all. We hold, therefore, that the trial court erred in holding that Chapter 160 of the Acts of the Legislature, 1947, was unconstitutional by reason of any supposed compact between the Commonwealth of Virginia and this State. We hold, also, that Section 10 of Article I of the Constitution of the United States has no application to the Ordinance and constitutional provisions aforesaid, because the same do not constitute a compact which in any way limits the power to the Legislature of this State to impose and collect taxes on its own territory.

The second question which we must determine relates to the procedure for the sale by the State of land returned delinquent for nonpayment of taxes, sold by the sheriffs of the several counties, purchased by the State, and not redeemed within the time provided by law. The sales here dealt with, other than three tracts sold in 1942 and 1943, were made prior to the enactment of Chapter 117, Acts of the Legislature, 1941, which repealed Article III of Chapter 37 of the Code of 1931, and substituted a new system for the sale of lands so acquired by the State. A determination of this question calls for discussion of the history of this State's dealing with land which was acquired by it at tax sales, subsequent to the adoption of our Constitution of 1872.

The pertinent provisions of Article XIII of the Constitution of 1872 have been quoted. The first legislation, under said Article, was by Chapter 134, Acts of the Legislature, 1872-3, and that Act provided for the sale of delinquent and forfeited lands. It did not differ materially from Chapter 105 of the Acts of 1868, except that it added a section protecting the former owners in their right to the surplus derived from any sale made, as provided for in Section 5 of Article XIII of the Constitution. In 1884, in the case of *McClure v. Maitland,* 24 W. Va. 561, Chapter 134 of the Acts of 1872-3 was interpreted as follows:

> "The proceedings provided by chapter 134 of the Acts of 1872-3 for the sale of lands for the benefit of the school fund are not judicial proceedings in the sense that they involve litigation between contesting parties; nor are they proceedings technically either *in rem* against the land, or *in personam* against the former owner of the land; but are in their character administrative, being simply a mode prescribed by the State for the sale of lands, which are her absolute property, and in the sale of which she alone is interested.

> "The effect of section 5 of article XIII of the Constitution of this State, giving to the former owner the surplus proceeds of the land over the

taxes, & c., does not confer upon him any interest in the land or right to participate in, or be a party to, the proceedings for the sale of it. The grant to him of such surplus proceeds is wholly gratuitous, and his claim thereto is confined to the proceeds as such and he can obtain them only in the manner prescribed by law.

"The former owner, having no interest in the land or the proceedings for its sale, is not entitled to be a party to the proceedings for the sale in the circuit court, and he, consequently, cannot appeal to this Court."

In the course of the opinion in that case Judge Snyder said:

"The title to the land and all the right and interest of the former owner having thus by his default and the operation of the law become absolutely vested in the State and become irredeemable, she having thus acquired a perfect title to, and unqualified dominion over, the land, had the undoubted right to hold or dispose of it for any proper purpose, in any manner and upon any terms and conditions she might in her sovereign capacity deem proper without consulting the former owner or anyone else. For after the forfeiture had become complete, as it had in the case before us, the former owner had no more claim to or lien upon the land than one who never had pretended to own it. * * * The laws, as we have shown, by their own force, transferred to and vested the title to the land absolutely in the State without any judicial enquiry or inquest of any kind. There could, therefore, be no necessity or reason for proceeding *in rem* against the land. That had already become the absolute property of the State and she had a perfect right to sell it without further enquiry. All the laws providing for the sale of these lands pre-suppose the title to have vested in the State prior to the commencement of the proceedings. In fact the whole authority of the commissioner and the jurisdiction of the court are based upon the assumption that the unconditional title is in the State; for unless such is the fact neither has any authority to act— *Twiggs v. Chevallie,* 4 W. Va. 463.

> "And all the right, title and interest of the former owner having been completely divested, he has not a particle of interest in the land—no more than if he had never owned it—there is, therefore, no possible reason for making him a party or proceeding against him *in personam* or otherwise. The proceeding is of necessity then neither *in rem* nor *in personam;* and as all judicial proceedings properly so styled must belong to either the one or the other of these classes, it follows that this is not and can not be in any technical sense a judicial proceeding."

The holding in *McClure v. Maitland, supra,* that the proceeding required under Section 4 of Article XIII of the Constitution was not a judicial proceeding, did not apparently meet with the approval of the Legislature, as will hereinafter appear; and this Court, in *Sims v. Fisher,* 125 W. Va. 512, 25 S. E. (2d) 216, held that:

> "Under Section 4 of Article XIII of the Constitution of this State, the proceeding therein required to be instituted in circuit courts for the sale of lands for the benefit of the school fund, must be a judicial proceeding, requiring process or notice in advance of hearing."

So far as we know, the ruling of *McClure v. Maitland* still stands except as modified by *Sims v. Fisher.* The ruling in *McClure v. Maitland* was based upon the provisions of Chapter 134, Acts of 1872-3, and the holding therein that to sustain a proceeding under Section 4 of Article XIII, absolute title to the land was required to be vested in the State, has been upheld throughout the years, and recently in the case of *State v. Farmers Coal Co.,* 130 W. Va. 1, 43 S. E. (2d) 625. Therefore, we rest our discussion on the basic fact that at the date of the institution of this suit, the former owners of land sought to be sold, and those claiming any interest therein, had lost all right, title or just claim to any of said lands, or any interest therein. The proposition advanced by one of counsel for the appellees, that under Section 4 of Article XIII, the right of redemption still exists, runs counter to all law on the sub-

ject, and if sustained would nullify the proceeding provided for in said section, and the State would be deprived of all power to dispose of the land, the title to which had become vested in it under the Constitution and laws of the State.

On March 18, 1882, the Legislature enacted a statute which radically changed the proceeding provided for by the Act of 1872-3, with which we have been dealing. This was effected by Chapter 95, Acts of the Legislature, 1882. That Act provided for a judicial proceeding for the sale of lands under Section 4 of Article XIII of our Constitution. It provided that such proceeding should be instituted by the Commissioner of Delinquent and Forfeited Land of the county in which the land proposed to be sold was located by the filing of a petition in the circuit court of said county, containing a full description of the land proposed to be sold, its value, and the name of any claimants thereto. Upon the filing of such petition, the persons effected thereby were required to be summoned to appear before a commissioner in chancery to show why the land should not be sold for benefit of the school fund, and said petition was required to be referred to a commissioner in chancery. Various provisions were made for the protection of the rights of former owners, and the case was to be proceeded with according to the rules pertaining to regular chancery causes. There has never been any doubt that under this Act the proceeding was a judicial one, and it has been so held in many cases among which are: *Holly River Coal Co. v. Howell*, 36 W. Va. 489, 15 S. E. 214; *Hays v. Camden's Heirs*, 38 W. Va. 109, 18 S. E. 461; *Moore v. McNutt*, 41 W. Va. 695, 24 S. E. 682; *Sims v. Fisher, supra*.

This statute, with amendments, not here material, remained in force and effect until the enactment of Chapter 117, Acts of the Legislature, 1941, and with exception of three tracts, all of the lands sought to be sold in the pending suit were sold prior to the enactment of the 1941 statute. Of course, as the statute existed prior to 1941, the owner of property was charged with the duty of paying his taxes,

and was accorded the right to redeem his land at any time prior to the date fixed when the land became irredeemable and became the absolute property of the State. The present contention appears to be that the former owners of property, the title to which has become absolutely vested in the State through its purchase at a sheriff's tax sale, and the failure to redeem within the time required by law, have some character of contract right which entitles them to insist that before the land they formerly owned can be sold by the State, all of the terms and provisions of the 1882 statutes, as amended (Code, 37-3) must be complied with; that out of that statute some character of contract has arisen binding the State, and on which a former owner may rely; and it is said that failure to comply with such supposed contract amounts to a violation of the obligation thereof, inhibited by Section 10 of Article I of the Constitution of the United States. This is the heart of the question submitted to us for our determination.

Chapter 117, Acts of the Legislature, 1941, was intended to be and was a radical departure from the law as it existed prior to the date of such enactment. In the first place it returned to the administrative procedure for the sale of forfeited and delinquent lands which this Court, through Judge Snyder, upheld in *McClure v. Maitland, supra,* and the duty of the administration of the plan proposed was imposed on the Circuit Courts of the several counties of the State. As stated above, we held in *Sims v. Fisher, supra,* that the proceeding provided for in Section 4 of Article XIII of our Constitution should be a judicial proceeding. We further held that if an administrative proceeding was permissible, the Legislature could not impose upon courts the duty of administering such a plan, and on that ground the Act was held unconstitutional. But there was no holding in that case on the question of the legal right of former owners to be made parties to such a proceeding and to have notice thereof, and that question was not raised.

By Chapter 140, Acts of the Legislature, 1945, a further attempt was made to provide for the sale of forfeited and

delinquent lands, title to which was vested in the State, and following our holding in *Sims v. Fisher, supra,* the proceeding provided for in that act was a judicial one. But, the Legislature made the mistake of permitting the redemption of lands sold for taxes at any time after the sheriff's sale, and before the final confirmation of sale in the Circuit Court in the county in which it was located, the effect of which was that the land could never become irredeemable and, therefore, not subject to sale under Section 4 of Article XIII of the Constitution. This act was held unconstitutional on this ground in *State v. Farmers Coal Co., supra.*

The Legislature, by Chapter 160, Acts of 1947, made still another attempt to provide for the sale of forfeited and delinquent lands. This Act corrected the defect pointed out in *State v. Farmers Coal Co., supra,* and fixed a date when redemption of lands theretofore sold might be effected, and provided that after such date the land should become absolutely irredeemable; and provided for a judicial proceeding for the sale of lands as provided by Section 4 of Article XIII, aforesaid. This legislation was subjected to a vigorous attack in the Circuit Court of McDowell County, in the case of *State v. Blevins,* and was considered by this Court on appeal. See *State v. Blevins,* 131 W. Va. 350, 48 S. E. (2d) 174. We will not go into detail in discussing the holding in that case. We upheld the provision of the Act providing for the entry of an order of publication without affidavit, and held that such method was not in violation of the Federal or State Constitutions. We further held that:

> "A former owner of land sold or forfeited to the State for nonpayment of taxes or nonentry on the land books, and those claiming under, or acting for, such owner, are not denied, by Code, 11A-4-27, as amended any privilege or immunity guaranteed by the Fourteenth Amendment to the Constitution of the United States and by Section 10 of Article III of the Constitution of West Virginia. Nor is such former owner and those in

privity with him deprived of any property by
such statute."

Many other questions passed upon in our decision in that
case, we do not deem necessary to discuss.

This brings us to the point where it seems necessary to
outline the provisions of Chapter 160, Acts of 1947, which
bear on the points at issue in the case now before the
Court, and this calls for some detail references to the Act
itself. We do not think it necessary to discuss the declaration of the legislative purpose, the section constituting the
Auditor as Commissioner of Forfeited and Delinquent
Lands of the State, and providing for the appointment of
a deputy commissioner in each of the counties, nor Section
9 of the Act requiring the Auditor of the State to certify
a list of lands to be sold to the Circuit Courts of each
county of the State. Section 10 provides that as soon as
possible after receipt of such list, the Deputy Commissioner of Forfeited and Delinquent Lands shall institute, in
the circuit court of his county, a suit or suits in chancery
for the sale, for the benefit of the school fund, of all lands
included in the list certified. Section 11 provides that in
such suit there shall be named as party defendant the
former owner in whose name any of the land proposed to
be sold was forfeited or returned delinquent and sold by
the sheriff, and other persons known to have a claim or
interest in the land proposed to be sold. Section 12 provides for the form of the summons to be issued in such
suit, and that: "The summons shall be served on the
named defendants in the manner provided by law for the
service of process in other chancery suits." The section
further provides that the clerk of the Circuit Court, at the
time he issues the summons, should enter an order of publication without the filing of affidavit as required in other
cases, and then goes on to prescribe the form of such order, and what it shall contain, specifically providing that
it shall list all lands proposed to be sold, and give the
name of the former owner, the names of such other de-

fendants as may be interested therein, and that it shall require all unknown parties who are or may be interested in any of the land to appear within one month after the date of the publication thereof and protect their interests. Up to this point it would appear that, except for the provision for entering an order of publication without affidavit of non-residency, or other matters which would justify such an order in regular cases, the requirement that the former owner be made party and served with process does not differ from the law as it was prior to the Act of 1941, aforesaid. But, at the end of the section there is added this language:

> "In view of the fact that the state has absolute title to all forfeited land, to all land sold to the state for nonpayment of taxes and become irredeemable, to all escheated land, and to all waste and unappropriated land, and must under the constitution have such an absolute title before the land may be sold for the benefit of the school fund; and in view of the fact that the former owner of any such land, or any person claiming under him, has no further interest therein nor rights in respect thereto except such privilege of redemption as may be extended to him by the Legislature as an act of grace; and in view of the further fact that all parties known and unknown who may claim an interest in any of the lands included in the suit are given notice thereof by the order of publication provided for above; therefore, the Legislature deems it both expedient and necessary to provide that failure to name any such person as a defendant, or failure to serve the summons on any named defendant, shall in no wise affect the validity of any of the proceedings in the suit for the sale of the state's title to such land."

The apparent inconsistency disclosed by the provisions of the section lies in the fact that one provision requires that the summons issued shall be served on named defendants in the manner provided by law for the service of process in other chancery suits, and the other that the failure

to do so shall in no wise affect that the validity of the proceeding, from which it may be argued that a Deputy Commissioner of Delinquent and Forfeited Lands may name or fail to name the former owner or other interested parties as defendants, and serve or fail to serve the process issued in the suit, without risk of invalidating any proceedings which might be taken in the cause. The Act then goes on to provide, in Section 18, for the redemption of lands before confirmation of sale. By Section 19 it provides that any person substantially interested might appear in the circuit court, any time before the sale, and move for the dismissal of the suit on any one of six grounds, namely: (1) That all taxes due thereon were paid before the sale to the State; (2) that the land was redeemed after the sale to the State; (3) that the land was not escheated; (4) that the land was not forfeited for nonentry; (5) that the land was sold to him for the benefit of the school fund and had not thereafter been sold for nonentry; and (6) that he had acquired title to the land by transfer under the provisions of the Constitution. Sections 20 and 21 provide for a reference to commissioners in such cases and the execution of such references. Then follows provisions for the decree of sale, the notice of sale of the land, its purchase by anyone other than the former owner or a deputy commissioner or other officer acting in connection with the proceeding. Section 28 protects the right of the former owner to the surplus. Section 30 provides that any person entitled, under the provisons of Section 19 of the Acts, who has not learned of suit in time to protect himself before the sale, might at any time after the sale, and before confirmation, apply to the court for an order setting aside such sale. Provision is made in the Act for redemption by persons under disability, and other sections relate to the reports required to be made, and the disposition of the fund realized from the sale. Section 39 of the Act releases all taxes prior to the year 1936, an act of grace which was no doubt offered as an inducement to delinquent tax payers to redeem their property.

The attack on this statute is, in our opinion, somewhat nebulous. Running through the several points of attack are insinuations, if not direct charges, of some unholy purpose or artful design to by-pass certain alleged rights of former owners, and others interested in land proposed to be sold, but as we read this Act, we think the interests of former owners are fully protected, unless it be the provision of Section 12 of the Act under which it may be claimed that lands formerly owned by an individual may be sold without notice to him, or the service of any process. Undoubtedly, if the former owner had any legal right or interest in the land proposed to be sold, after the same had become irredeemable, and absolute title thereto had become vested in the State, something which, as we see it, is, logically, impossible, then the failure to give notice by legal process would make void any order or decree entered in the cause, so far as the same affected the interest of the person who was not served with process. This is a proposition of law so fundamental as to require no further discussion. The whole question is reduced to the point whether the former owner of land, having lost all of his right, title, and interest therein, through his own fault, in that he has failed to perform his duty to the State by the payment of his taxes, and the land having become the absolute property of the State, may question the right of the State to dispose of the same without notice to him. That, it is contended, in substance and effect, is what Section 12 of the Act provides, and, on the basis of that contention, we must determine whether that provision of the Act may stand the test of our State and Federal Constitutions.

The question, in the last analysis, is one of legislative power. By the Acts of 1872-3, the Legislature set up and provided for the disposition of forfeited and delinquent lands. According to *McClure v. Maitland, supra,* neither that Act, nor the Constitution of 1872 on which it was based, required that the former owner of land should be made party to the proceeding provided for by Section 4 of Article XIII of the Constitution. The Acts of 1882,

above referred to, changed that system and provided for a judicial proceeding, in which former owners were required to be made parties, and the proceedings for the sale of such lands, provided for in the Constitution, were to be conducted generally as in other suits in chancery. So long as that legislation remained in existence, this Court enforced the same to the letter. As late as 1937, in the case of *Bank of Quinwood v. Becker,* 119 W. Va. 534, 194 S. E. 849, we held that the failure to make interested persons parties to a proceeding to sell lands vested in the State, under purchase at a tax sale, was fatal to the proceedings, so far as it effected the persons not made parties to the suit. To the same effect is *Neal v. Wilson,* 79 W. Va. 482, 92 S. E. 136. In that case, however, it was stated in the body of the opinion that:

"The power of the legislature to provide for a sale of the State's land, without any judicial inquiry whatever, as was formerly done, must be admitted, * * *."

This quoted statement, which has been disapproved in *Sims v. Fisher, supra,* indicates that while the Court, at that time, was disposed to hold litigants to the strict letter of the statute of 1882, the right of the State to proceed in another manner, and without requiring such persons to be parties, was conceded. But, the fact that the Legislature has at one time adopted a particular plan for the sale of delinquent and forfeited lands, does not mean that the same Legislature, or a succeeding one, may not change that plan and adopt a different one provided, of course, it does not infringe upon the provisions of the Constitution of the United States or of this State. The whole question resolves itself into this: Does the former owner of land, who, through his failure to pay his taxes either in the first instance or by the redemption process, have any legal right to be consulted, or to be notified, as to any proceeding which the State of West Virginia may institute, under Section 4 of Article XIII of our Constitution,

to effect the sale of its own property? Or, to state it another way: Does an act of the Legislature, which, as a matter of grace, has extended to the former owner the privilege, or, it may be the statutory right, to redeem his land from a tax sale, and which, at the same time, provides for a certain procedure on the part of the State in proceedings to sell land, after the privilege or statutory right to redeem has ended, and the absolute title thereto has become vested in the State, create a contract between the State and such former owner, which subsequent Legislatures may not in anywise impair by the exercise of legislative power?

The fundamental error of those who would sustain the theory of a contract between the State and former owner of real estate sold for nonpayment of taxes and purchased by the State lies in their ignoring the fact that the supposed contract which they would enforce is based upon the fault of the former owner. We have heretofore adverted to the duty of all citizens to contribute to the burden of taxation, necessary to the existence of the State, whose government is set up for their benefit and protection. We do not think it should be held that a taxpayer may be permitted to fail in his duty to the State, and use that failure as a basis for the assertion of a contract right which would tie the hands of the State in the collection of its taxes. When we say that a taxpayer, who fails in his duty in that regard, is at fault, we mean legally at fault. We are fully aware that circumstances may arise where the failure to pay taxes is the result of circumstances beyond the control of the taxpayer, and a person in that situation should not be condemned therefor. In other cases, however, failure to pay taxes is due to neglect, and in some instances to a deliberate design to evade the payment of taxes. Statutes which provide for the enforced collection of taxes should not be nullified to meet the convenience of the taxpayer; just as in the case of the collection of any debt, the enforcement of laws are not denied the creditor

merely because of the poverty of the debtor, or his disinclination to pay his debts.

Aside from this, we find no support in the authorities for the proposition that where there has been a sale of real estate for the nonpayment of taxes, and its purchase by the State; and where there exists a statute under which he is given time to redeem, and fails to do so; he may prevent the collection of such taxes on any theory of a contract which limits the State in its remedy to subject to sale the property taxed, under some theory of a contract not to do so. It is true that land sold by a sheriff for taxes to individual purchasers, creates a contract with the State, in respect to the time in which the same may be redeemed, and as to other provisions of the statute as it existed at the time of the sale. See *Forqueran v. Donnally,* 7 W. Va. 114; *Milkint v. McNeeley,* 113 W. Va. 804, 169 S. E. 790; *Lemley v. Phillips,* 113 W. Va. 812, 169 S. E. 789; *Arbogast v. Donahoe,* 120 W. Va. 53, 195 S. E. 672. But in Cooley on Taxation, 4th Ed., Sec. 1561, it is stated:

"* * * Lengthening the time within which the land may be redeemed, as applicable to tax-sales already made, is unconstitutional as impairing the obligation of a contract. The same rule, some have thought, should apply to a statute shortening the time to redeem; as it is equally unjust to legislate against the owner of the land in such circumstances as in his favor. But with him there is no contract when the sale is made, and the remedy by redemption which the statute gives him, like remedies in general, is subject to legislative discretion. Where lands are struck off to the state, there is unquestionable power in the legislature to favor or relieve the owner of the land to any extent it may see fit."

This, we think, is unquestionably true in a case where land has been sold to the State, not redeemed, and has become the absolute property of the State, for the reason that the land owner has been given his opportunity to redeem and

has failed to do so, and when he has failed to do so he has lost all of his right, title and interest in the property involved. *McClure v. Maitland, supra; State v. Farmers Coal Co., supra.* We find the subject discussed in 51 Am. Jur. under the head of Taxation, Sections 1127, 1128, wherein it is said:

> "Although tax redemption statutes which define the time within and the conditions upon which a property owner may redeem his property from a tax sale are universally recognized as giving rise to contractual obligations in favor of the tax sale purchaser which cannot be changed in matters of substance to his detriment after he acquires title at a tax sale, there is a difference of opinion as to whether rights of the property owner may be so regarded. It seems to be the theory of the majority of the cases directly considering the question that since the right of redemption and time for exercising it are accorded by the state as matters of grace and not of right, the legislature has the power to modify the exercise of the right in substantial particulars by subsequent legislation. Under this rule, statutes reducing the period of redemption from tax sales, when given retroactive operation to previous sales, do not constitute an unconstitutional impairment of contract obligations. In this connection it is to be noted that in several cases the validity of a retroactive provision reducing the redemption period has been sustained upon the theory of being remedial in character. Moreover, the property owner cannot, on the ground of impairment of contract obligation, complain of a subsequent enacted statute according to the tax sale certificate holder a privilege or proceeding under such new act to foreclose the owner's right of redemption, where the choice to proceed under the new act results in giving the delinquent taxpayer more time within which to redeem.
>
> "Many cases, on the other hand, support the view that the owner's right of redemption from a tax sale, although of purely statutory origin, is contractual in its nature, and, in all matters of substance, must be governed by the law in force

at the time of the tax sale, at which time the right of redemption attaches, and cannot be affected in matters of substance by subsequent legislation. And in applying this rule, it has been held that an attempt to reduce the period of time for redemption, if retroactively applied to a sale made before the passage of the statute, is unconstitutional."

Chapter 160, Acts of 1947, gives to the former owner additional time in which he may redeem, and specifically fixes a date beyond which date he may not redeem, and at which time, by reason of his failure to avail himself of the opportunity to redeem, he loses all of his right, title and interest in the property.

It is further stated in the last cited authority, Section 1128, that:

"It is to be noted that the rights of purchasers at tax sales which are protected from subsequent legislation are those of private purchasers. Rights of a county, municipality, or other political subdivision purchasing in property at a tax sale with respect to rights of redemption are not considered contractual in their nature, and are not protected from impairment of subsequent legislation by the guaranty of impairment against obligation of contract. Neither does the rule that rights in tax proceedings are to be determined by the law in force at the time of the tax sale prevent the legislature from making changes in the manner of enforcing the lien which do not substantially impair any of the obligations of the contract."

In *Mercury Herald Co. v. Moore*, Cal., 138 P. (2d) 673, 147 A. L. R. 1111, and, in an annotation thereto, this theory is clearly upheld, and it is stated in the body of the opinion in that case that:

"This court has held in numerous cases, and it appears to be in agreement with the weight of

authority, that the general relationship of sovereign and taxpayer is not founded on, nor does it create, any contractual rights; and the obligation of the citizen to pay taxes is purely of statutory creation, and taxes can be levied, assessed and collected only in the method provided by express statute. * * * It has also been held by this court that the power of taxation is not founded upon consent or agreement but, rather, that tax proceedings are in invitum, and has given that as its reason why all tax proceedings should be strictly construed. Judge Cooley in his work on taxation points out that as between the owner of property and the sovereign power imposing the tax there is no relationship based upon contract and that as to the owner, 'the remedy by redemption which the statute gives him, like remedies in general, is subject to legislative discretion'."

See also *James Alexander, Inc. v. United States,* 128 F. (2d) 82; *Messer v. Lang,* 129 Fla. 546, 176 So. 548; *State Nat. Bank. v. Morthland,* 196 Ark. 346, 118 S. W. (2d) 266; *Muirhead v. Sands,* 111 Mich. 487, 69 N. W. 826; *Baker v. State Land Office,* 294 Mich. 587, 293 N. W. 763; *Butler v. Palmer,* 1 Hill (N.Y.) 324.

No authority has been cited by the appellees which conflicts with the principles announced in the cases above referred to, and the other authorities cited. The authorities cited amount to nothing more than to express the general rule that no one has a vested right in a given procedure, so long as the procedural change made does not materially affect vested rights. We know, as a matter of common knowledge, that changes are frequently made in statutes with respect to the time within which jurisdiction may be invoked in the courts of the land, and we do not think a case can be found which holds such laws to be unconstitutional, so long as they do not materially affect vested rights. This Court, in *McClintic v. Dunbar Land Co.,* 127 W. Va. 454, 33 S. E. (2d) 593, stated in the body of the opinion that:

"However, a mere change in the remedy for the enforcement of contract rights in the courts of the State, or otherwise, is not treated as an impairment of the obligation of a contract, so long as the person whose rights arise thereunder is given a reasonable opportunity, after the creation of such limitation, to enforce his contract."

That case was decided on the basis of an existing contract, a situation which we do not think arises in this case, because we do not believe there was ever any character of contract between the former owner and the State of West Virginia which such former owner may invoke to impede or destroy the right of the State to collect its taxes. After all, that is the underlying purpose of Section 4 of Article XIII of our State Constitution.

The procedure for the collection of taxes stands on a different footing from suits, actions and other proceedings for the collection of debts under the common law, or statutes designed therefor. That subject was fully discussed in *State v. Blevins, supra*. That summary proceedings may be resorted to for the collection of taxes is well sustained by the authorities. In 3 Cooley on Taxation, 4th Ed., Section 1326, it is stated:

"Very summary remedies have been allowed, in every age and country, for the collection by the government of its revenue. * * * The protective principles of the common law are not supposed to be violated by a resort to summary proceedings in these cases. Summary processes are not necessarily unjust, * * *. There is a tacit condition annexed to the ownership of property that it shall contribute to the public revenue in such mode and proportion as the legislative will shall direct. * * *"

In the same authority, Section 1405, it is stated:

"Proceedings of this nature are not usually proceedings against parties, nor, in the case of

lands or interests in lands belonging to persons unknown, can they be. They are proceedings which have regard to the land itself rather than to the owners of the land, and if the owners are named in the proceedings and personal notice is provided for, it is rather from tenderness to their interests and in order to make sure that the opportunity for a hearing is not lost to them, than from any necessity that the case shall assume that form. ***"

We need only add that in *King v. Mullens*, 171 U. S. 404, it is stated in the body of the opinion that:

"Much of the argument on behalf of the plaintiff proceeds upon the erroneous theory that all the principles involved in due process of law as applied to proceedings strictly judicial in their nature apply equally to proceedings for the collection of public revenue by taxation. On the contrary, it is well settled that very summary remedies may be used in the collection of taxes that could not be applied in cases of a judicial character."

The opinion then goes on to discuss that statement and the same appears to be amply supported by the authorities there cited.

As we have stated, every substantial argument against the constitutionality of Chapter 160, Acts of 1947, centers on Section 12 of that Act. There seems to be a strange misconception as to the force and effect of that section. The statute begins by providing that a summons shall issue, and then provides: "The summons shall be served on the named defendants in the manner provided by law for the service of process in other chancery suits." We would only have to refer to Article 3 of Chapter 56 of the Code, to determine how process should be served. There is, however, the provision for the entry of an order of publication, without filing the affidavit which would be required in ordinary chancery suits. We have heretofore held this

508

particular provision to be valid. *State v. Blevins, supra.* As to parties who by reason of non-residence, or otherwise, are not served with process, it does not seem to us that any substantial right has been taken away from them by this provision. An order of publication is required to be entered, and when entered and published serves to give the same notice that interested parties would have received had there been filed an affidavit of their nonresidence, or the setting up other grounds which, under general law, would authorize the entry of an order of publication. But, the section ends with this sentence: "* * * therefore, the Legislature deems it both expedient and necessary to provide that failure to name any such person as a defendant, or failure to serve the summons on any named defendant, shall in no wise affect the validity of any of the proceedings in the suit for the sale of the state's title to such land."

As we construe this statute, it is the mandatory duty of the State, in a suit instituted by it under Section 12 of Chapter 160, of the Acts of 1947, to secure the personal service of process on all named parties residing within the jurisdiction of the court in which the suit is instituted. It seems to us to be within the power of the circuit courts, and, in our opinion, their duty as well, to require process to be served on all persons within their jurisdiction. It is not necessary to comment on the undoubted power of the courts to make and enforce this requirement. In the case at bar, the appellees, the only parties appearing in the case, have either been served with process, or by their general appearance in the cause, have waived that service, and they stand in court in the status of persons who have been served with process. The last sentence of Section 12 quoted above does not prejudice them, for the reason that they are in court with the right to make the defenses hereinbefore referred to, with the privilege or right of redemption, and the right to exercise the other privileges or rights which the statute gives them. In our opinion, Section 12, as a whole, is constitutional on the theory that, as so early held in *McClure.*

*v. Maitland, supra,* a former owner of land, or persons holding liens against same, have lost all of their rights when the title to the land they own or had claim to became completely vested in the State. Even if this were not true, the question of the unconstitutionality of the last sentence of that section could only arise in a suit to sell such land, where there had been no process served on the former owner or other interested party, in a case where such process could be had. Giving to the Act this construction, we are unable to see where the appellees in this case have been deprived of any substantial right, assuming, for the sake of argument, they had any right in the land involved at the date of the institution of this suit. As to residents of this State, Circuit Courts of the several counties have it within their power to require the service of process on all defendants within their jurisdictions, and we will not assume that they will fail to exercise that power. When this is done there would seem to be little in which any former owner can complain. In making this holding, we follow the holdings of this Court under the Act of 1882, and make effective the legislative mandate.

In view of the mandatory requirement of service of process continued in the first portion of Section 12, of the 1947 Act, we are of the opinion that the last paragraph thereof should be construed as intended to cover cases of inadvertence, or, in particular, where the names of owners and claimants are not known, and not as nullifying the requirement of service aforesaid. By giving to this portion of the section this construction, we reconcile, to some extent, the apparent inconsistency aforesaid.

In the brief filed by the Attorney General for the State, it is assumed that a violation of the supposed compact between the Commonwealth of Virginia and this State, and Section 1 of Article XIII of our Constitution, lies in the fact that under Chapter 117, Acts of the Legislature, 1941, dispensed with the requirement theretofore existing that before property could be returned delinquent, it must appear from the affidavit of the sheriff, attached to the de-

linquent list, that the taxes assessed could not be collected from the personal estate of the taxpayer, constituted the sole violation of the supposed compact, and constitutional provision. We have treated the matter in a much broader aspect, being of the opinion that the trial court had it in mind that the supposed compact and constitutional provision had been violated in many other respects. However, this may be, the same question was raised in *State v. Farmers Coal Co., supra,* and was dealt with by this Court in the way of dicta. We there said:

"The first of these questions is that raised in the opinion of the trial court, in which it holds as illegal the returning of real estate delinquent, without a diligent effort to resort to the personal property of the owner for the taxes assessed against such real estate. We have read the very interesting and instructive discussion of the trial court upon the general policy of the law, covering a period of more than 700 years, to make personalty the primary fund for payment of debts and taxes, to the end that the ownership of land may be preserved and protected to the widest extent possible. We do not question this policy, although it has been somewhat relaxed in modern times. The right of the owner of land to pledge it for debt by contract is universally recognized. Taxes are by statute made a lien upon real estate, and it is made the duty of the owner of real estate to return it for assessment, and to pay the taxes assessed thereon. When he fails to perform that duty, he becomes a delinquent, which gives rise to the right of the State, for itself and its subdivisions, to enforce said lien by sale of the land, the first step in such enforcement being a declaration of delinquency, even though the right to resort to personal property for such taxes still exists. Land is, under our law, made liable for the debts of the owner, although as to landowners who die intestate personal property must be first applied to existing indebtedness to the relief of the real estate; and ordinarily suits may not be instituted to sell lands for the benefit of creditors until there has been a return

of execution 'No property found.' However, this requirement does not exist beyond two years from the date of a judgment, and after that time the lien of the judgment may be asserted against real estate without the issuance of an execution.

"The wisdom of what the Legislature did in enacting Section 11, Article 2, Chapter 117, Acts of the Legislature 1941, cannot be considered by this Court. The question involved is one of legislative power. It may be that a strict application of the common law would sustain the trial court's position on this question; but, unless restricted by the Constitution, the Legislature may change the common law at any time it sees fit. Section 21, Article VIII of our Constitution provides: 'Such parts of the common law, and of the laws of this State as are in force when this article goes into operation, and are not repugnant thereto, shall be and continue the law of the State until altered or repealed by the Legislature.' We think the Legislature had the power to prescribe the form of the oath of the sheriff required to be affixed to a delinquent list so as to relieve the sheriff of being required to swear that he had used due diligence, without success, to find property within his county subject to levy for taxes."

We need only add that we can conceive of no prejudice to the owner of land, when the State waives its right to collect taxes due thereon out of his personal property. Debtors do not usually complain when their creditor yields some of his rights respecting the collection of his debt. We think the Legislature had full power to provide for the collection of taxes out of the land taxed, without resort to the personal property of the landowner, if it thought it wise to do so; and we do not think the landowner can complain of legislative leniency in this respect. Furthermore, it is not improper to say that the two tracts of land proceeded against of which appellees are the former owners, were each returned delinquent prior to the enactment of Chapter 117 of the Acts of 1941, and the same situation applies to all of the other tracts proceeded against, except

the three tracts sold in the years 1942 and 1943, after Chapter 117 was enacted. We adhere to our holding in *State v. Farmers Coal Co., supra,* and make it a point of decision in this case.

We hold, therefore: (1) That when the real estate proceeded against in this cause became irredeemable on the 1st day of July, 1947, the former owner, and all persons having an interest in, or liens upon said land, lost all their right, title and interest therein, and the said land became the absolute property of the State; (2) that under the Constitution of this State a judicial proceeding is necessary to sell said lands under the provisions of Section 4, Article XIII of our Constitution, and that in said proceeding the Legislature has the power to provide for such sale without making the former owner or other interested persons therein a party thereto; (3) that the provisions of Sections 11 and 12, Chapter 160, Acts of the Legislature, 1947, providing that former owners, and other interested perons, be made parties to such proceeding, and requiring the service of process on parties defendant, and an entry of an order of publication as to those not served, constitutes only an act of grace on the part of the State, and not an act required by Section 4 of Article XIII of the Constitution of this State; (4) that Chapter 95, Acts of the Legislature, 1882, providing for a judicial proceeding for the sale of lands returned delinquent for the nonpayment of taxes, did not operate to create a contract between the State of West Virginia and the owners of the land, and that the enactment of Chapter 160 of the Acts of 1947, in so far as it may have changed the proceeding provided for in the Acts of 1882 aforesaid, was within the power of the Legislature and is constitutional and valid; (5) that Chapter 160, Acts of 1947, aforesaid, requiring the service of process on all parties to the proceeding therein providing for, if within the jurisdiction of the court in which such proceeding or suit is instituted, is valid and binding on the Circuit Courts of the various counties of the State, and that such courts have the power, and, in our opinion, are charged with the duty of requiring the serv-

ice of such process on all persons residing in this State, who can be located and served; and (6) that Chapter 160 of the Acts of 1947, does not violate the provisions of Section 10, Article I of the Constitution of the United States, nor Section 1 of Article XIII of the Constitution of this State, and is valid and binding upon the courts of this State.

We, therefore, reverse the decree of the Circuit Court of Webster County, dismissing plaintiff's bill, and remand this cause to that court, with directions that the same be reinstated on the docket thereof, and that the cause be hereafter proceeded with in accordance with this opinion, and as such cases are required to be proceeded with in courts of equity.

*Reversed and remanded with directions.*

Lovins, Judge, concurring:

I agree with the decision of the Court and the result reached in all respects except as to that part of the opinion holding that Section 12, Chapter 160, Acts of the Legislature, Regular Session, 1947, is mandatory in requiring the service of process on former owners and other named defendants. Such proposition is embodied in the latter portion of point 4, and in point 7, of the syllabus herein. As to the same, as well as to those portions of the opinion wherein that proposition is discussed, I disagree.

In the first place I do not believe that either point 7 or point 4 of the syllabus can be treated as questions for decision in this case. It is to be pointed out that only two of the defendants herein contest this proceeding as instituted by the State. As the opinion of the Court states, each of those two defendants "made a general appearance", filing their separate demurrers. It is from the action of the trial court on such demurrers that this appeal was granted.

514

It is too well settled to require citation of authorities that a general appearance waives, and thereby cures, all defects in process, as well as all defects in the service thereof. Such being the case, questions relating to the validity of the process herein and the validity of the service thereof, do not and can not arise on this appeal. Accordingly, it is my opinion that those portions of the opinion of the Court wherein Section 12, *idem,* is discussed, are essentially *obiter,* and should not be included in points of the syllabus herein.

But, treating the question of the validity of either the process or the service thereof as a point of decision herein, I disagree with the opinion of the Court thereon. I think that under the guise of interpreting and construing Section 12, *idem,* this Court has attributed to the Legislature an intent which, by the farthest stretch of the imagination, can not be read therein. On the other hand, I think that the Legislature has clearly and unequivocally stated its intention with reference to the requirement of process, and the service thereof, by stating "* * * that failure to name any such person as a defendant, or failure to serve the summons on any named defendant, shall in no wise affect the validity of any of the proceedings in the suit * * *." Section 12, *idem.*

Without further belaboring the point, my position thereon is fully supported by the action of the Legislature, subsequent to the decision of this Court herein, in the enactment of Chapter 134, Acts of the Legislature, Regular Session, 1949. That Act, which was introduced on March 9, 1949, as Senate Bill No. 276, was passed by the Senate March 9, 1949, and by the House of Delegates on March 11, 1949. The Act, which is effective from passage, was approved and signed by the Governor on March 18, 1949, and, in my opinion, is now the law of this State. In amending and reenacting Section 12, *idem,* said Act eliminates the form of summons, the provision relating to service thereof, and thus removes the basis for that part

of the opinion herein with which I disagree. The Act provides, among other things, as follows:

"\* \* \* in view of the further fact that all parties known and unknown who may claim an interest in any of the lands included in the suit are given notice thereof by the order of publication provided for above; therefore, the Legislature deems it both expedient and necessary to provide that failure to name any such person as a defendant shall in no wise affect the validity of any of the proceedings in the suit for the sale of the state's title to such land; and in view of the fact that the supreme court of appeals in a decision just rendered has held that there is no constitutional requirement that the former owner or any other interested person be personally served with process in a suit for the sale for the benefit of the school fund of lands that are and must be the absolute property of the state; and in view of the further fact that in its last previous enactment of this section the Legislature had no intention of requiring that personal service of process on named defendants in such a suit should be a mandatory condition precedent to the validity of any step or proceeding in such suit, but on the contrary expressly stated that failure to serve the summons on any named defendant should in no wise affect the validity thereof; now therefore, the Legislature also deems it both expedient and necessary to provide that the failure to obtain such personal service on any named defendant in any suit instituted under the provisions of this article prior to the effective date hereof shall in no way affect the validity of any step or proceeding in any such suit or the validity of the title acquired by the purchaser of land sold under any decree made or to be made in any such suit."

I regard the action of the Legislature in this respect as succinct and apropos. Accordingly, this concurrence is written.

I am authorized to say that Judge Riley joins in this concurrence.